Michael A. ADAMS, Appellant,

v.

Don ADAMS, individually and on behalf of Alaska Rubber & Supply, Inc., and ADA Investments, Appellees.

No. S–10271.

Supreme Court of Alaska.

April 23, 2004.

Larry L. Caudle, Anchorage, for Appellant.

1. *See* note 6 *infra.*

2. The premises are described as follows in the lease:

Wevley William Shea, Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

The power to avoid a contract due to misrepresentation can be lost if a party knowing or having reason to know of the misrepresentation affirms the contract. But this rule only applies in cases of non-fraudulent misrepresentations. Where there is fraud the power of avoidance is only lost if the party actually knows of the misrepresentation and affirms the contract. The main question in this case is whether, in the process of negotiating a lease, changing a right of first refusal to an option to purchase without notice should be considered a constructive fraud for purposes of applying this rule. We conclude that it should because of the strong deceptive tendency of such conduct.

## I. FACTS AND PROCEEDINGS

Michael Adams owns four contiguous lots on the Old Seward Highway in Anchorage. Adjacent to this property is property owned and used by Alaska Rubber & Supply, Inc. Effective October 1, 1996, Michael Adams leased his property to Alaska Rubber and Alaska Rubber's principal, Don Adams (collectively referred to in this opinion as Alaska Rubber). The lease had a three-year term. The focus of this case is a clause in the lease that is titled "Right of First Refusal," but is textually an unconditional option running in favor of Alaska Rubber to purchase the leased property at any time during the lease term for $300,000.[1] The lease also excepts from its coverage an L-shaped portion of about 3,750 square feet straddling two lots on which Michael Adams lives in a trailer and has a quonset hut and storage containers.[2]

1. *Premises:* Lessor shall let to Lessee and Lessee shall rent from the Lessor that certain property together with all improvements thereon including an 1,800 square foot building located on the property together with the real

A secondary issue is whether the option includes the excepted property.

The negotiations leading up to the execution of the lease began in earnest in July and August of 1996. On August 2, 1996, Michael Adams wrote Don Adams, president of Alaska Rubber, asking for a decision on leasing the property before the end of the month. The letter mentions a purchase option. It also contains language that suggests· that Michael Adams's objective was to sell the property after he found property suitable for a tax-free trade.[3] Michael Adams enclosed a proposed lease containing a right-of-first-refusal clause under which the lessee was granted an option to buy conditioned on the lessor attempting to sell the property and finding a buyer. In that event the lessee would have the right to buy on the terms agreed to between the lessor and the buyer.[4] Michael Adams testified that he brought the letter of August 2, 1996, and the first draft of the lease to Alaska Rubber and gave them to Alaska Rubber's general manager, Janeece Higgins, for transmission to Don Adams who resides in the state of Washington.

Subsequent to the delivery of the August 2, 1996 letter and the first draft, the parties met and discussed the prospective transaction. Michael Adams testified that they reached an agreement and that he instructed his attorney to prepare a second draft of a lease in accordance with their agreement. Larry Caudle, Michael Adams's attorney, prepared the second draft. In it the right of first refusal was changed by specifying the sale price, $300,000. But the lessee's option was still only exercisable when "Lessor at his sole discretion elects to sell the property during the lease term." After Caudle prepared the second draft, Michael Adams took it to Alaska Rubber and delivered it to Higgins.

The second draft was transmitted by Higgins to Don Adams, who sent it to Alaska

---

property as described in Exhibit "A" which is comprised of approximately Lots 19, 20, and 21 Meredith Subdivision and Parcel 14, T 13N R3W Sec 32 S1/2NW1/4: SW 1/4 less a portion of land indicated by a dashline shown in Exhibit A to be used by the Lessor for his exclusive use which is comprised of a portion of lot 19 currently utilized by Lessor as his residence which comprises approximately 50 by 50 feet located at the Eastern portion of Lot 19 and a portion of the Northeast corner of Parcel 14, approximately 50 feet by 75 feet where Lessor is currently storing a quonset hut, corner containers and a well. It is agreed that Lessor reserves access to the property reserved by Lessor as set forth in this paragraph and that Lessee shall not interfere with Lessor's ingress and ingress to Lessor's reserved portion of the property. The 1800 square foot building and land described above (excluding the portion reserved for Lessor's use) are referred to throughout this lease as "Premises."

3. In relevant part the August 2, 1996 letter stated:

I would like to make a decision before the end of the month and it appears I will have to speak only to you. In the event you will be involved with the property you will have it for your use and make any arrangement with others according to your wishes. I have been ill and lost a lot of time and I am trying to put my future in prospective and get away from real estate. What would benefit me greatly would be some way I can reinvest from the sale into a tax free trade. It appears a short term lease with you with a purchase option would be the way that will benefit me. Perhaps a two year lease with an option would be suitable. The lease payments would be 3000.00 per month ... Ken with unique welding or machine shop would be willing to pay half of that and my tenant who occupies the building on the property is also willing to rent. Of the 3000 per month I will pay the land taxes which brings your outlet to 2500 or 2600 per month. If you exercise an option then in that event I will furnish you with an environmental phase two which you asked for. I had some one look over the premises and he commented that the property is relatively clean.

Enclosed is a copy of a lease I used for one of my properties. As you know leases are complicated so if you have one you would feel more comfortable with then prepare it and I will read it. Lets try for a three year lease at 3000.00 per month and an opportunity to purchase the property during the lease period. Chances are that I will find a trade soon and release you from the lease.

4. The right-of-first-refusal clause in the first draft read as follows:

35. *Right of First Refusal* the Lessor-owner may place the entire Premises on the Real Estate Market for sale and if the Lessor-seller finds a buyer, the Lessee shall then have the right of refusal to buy at those terms. In the event the purchaser demands Phase two environmental assessment the cost shall be shared equally on a non-refundable charge to the prospective buyer.

Rubber's attorney, Herbert Viergutz. Viergutz then prepared a third draft. The right-of-first-refusal clause in the third draft is almost identical to that in the second draft, except that two additional sentences are added at the end of the clause concerning sharing of the cost of any environmental phase two report that might be required in the event that lessee exercises its right of first refusal.[5] The third draft was delivered by Alaska Rubber to Michael Adams. Michael Adams reviewed it, brought it to Alaska Rubber's office, and stated that it was acceptable to him. Without then signing the draft, Michael Adams gave it to Higgins, who sent it to Washington for Don Adams's review and signature.

Don Adams read the third draft and did not agree with the right-of-first-refusal clause. In his view the parties had agreed that Alaska Rubber would have an option to purchase the property that was not contingent on Michael Adams's decision to sell. He instructed Viergutz to revise the clause so that Alaska Rubber's option to purchase would be unconditional. Viergutz made this change but did not change the caption of the paragraph. As a result, the paragraph was still titled "Right of First Refusal."[6] Don Adams signed this, the final draft, on behalf of himself and Alaska Rubber and transmitted it to Higgins. When the draft arrived at the Alaska Rubber office, Michael Adams came to the office and signed it without reading it. No one advised Michael Adams that the third draft had been changed and that the final draft contained an unconditional option to buy.

Almost three years passed. A month before the lease was to expire it was extended.

5. The right of first refusal in the third draft reads as follows:

39. *Right of First Refusal:* Lessor agrees to give Lessee a right of first refusal to purchase the subject property during the term of this lease. This right of first refusal shall not be enforceable unless Lessor at his sole discretion elects to sell the property during the lease term. In such event it is agreed the sale price shall be $300,000.00 net of any commissions and closing costs. If Lessee does not agree to sign an earnest money agreement within 30 days of receiving written notice of Lessor's desire to sell for $300,000.00 as set forth herein, Lessor shall be allowed to sell the property to anyone at market price. In the event Lessor sells to a third party, Lessor shall give Lessee 30 days prior written notice of the date Lessor intends to complete the sale of the property. Upon closing and completion of the sale, this lease and Lessee's rights hereunder shall become null and void and this lease shall be terminated except for any liability of Lessee or Lessor arising from any breach of any provision herein. The earnest money agreement shall require $30,000.00 as non-refundable earnest money and balance of purchase price of $270,000.00 to be paid within 90 days after the date set forth in the earnest money agreement. In the event an environmental phase two is required at the time of sale, the cost is to be shared equally by both parties, the parties being buyer and seller. In the event the property is not purchased due to an unfavorable report, each party shall also share equally in the cost of the report.

6. Clause 39 of the draft that became the lease reads as follows:

39. *Right of First Refusal:* Lessor hereby grants to Lessee an option to purchase the subject property during the term of this lease. The Lessee, at his sole discretion, shall have the option to elect to purchase the property at any time during the lease term. In such event, it is agreed the sale price shall be $300,000.00 net of any commissions and closing costs. Lessee shall sign an earnest money agreement within 30 days of exercising his option to purchase by providing written notice of Lessee's desire to purchase for $300,000.00 as set forth herein. In the event Lessee fails to exercise his option to purchase within the Lease term, or fails to execute the earnest money agreement as provided herein, Lessor should be allowed to sell the property to anyone at market price. In the event Lessee fails to execute the earnest money agreement within 30 days of providing written notice of intent to purchase, Lessor may sell to a third party, in which event Lessor shall give Lessee 30 days prior written notice of the date Lessor intends to complete the sale of the property. Upon closing and completion of the sale, this lease and Lessee's rights hereunder shall become null and void and this lease shall be terminated except for any liability of Lessee or Lessor arising from any breach of any provision herein. The earnest money agreement shall require $30,000.00 as non-refundable earnest money and balance of purchase price of $270,000.00 to be paid within 90 days after the date set forth in the earnest money agreement. In the event an environmental phase two is required at the time of sale, the cost is to be shared equally by both parties, the parties being buyer and seller. In the event the property is not purchased due to an unfavorable report, each party shall also share equally in the cost of the report.

for an additional two years. This was accomplished by a letter prepared and signed by Michael Adams that he delivered to Alaska Rubber on August 30, 1999, and that Don Adams assented to on September 15, 1999.[7] The circumstances leading up to the lease extension are in dispute.

Michael Adams testified that he prepared the letter extending the lease because the lease was about to expire and he wanted to know Alaska Rubber's intentions in advance of the expiration date. But Higgins testified that the lease was renewed after a conversation that she had with Michael Adams in which she told him that Alaska Rubber wanted to purchase the property. According to Higgins, Michael Adams said that he would get back to her, and when she did not hear from him, she telephoned him and again told him that Alaska Rubber wanted to exercise the option to purchase. She testified that Michael Adams told her that he did not believe that he had to sell the property, that she disagreed, and that he told her that he would look into it and get back to her. The next event of significance according to Higgins was her receipt of the lease extension from Michael Adams described above. The trial court accepted Higgins's description of the events leading up to the lease extension.

On November 29, 1999, Alaska Rubber sent a certified letter to Michael Adams exercising its option to purchase the property. Michael Adams refused to sell. Alaska Rubber brought the present action seeking specific performance or damages for breach of the lease agreement. Michael Adams filed a counterclaim, seeking a declaration that the lease is null and void because of Alaska Rubber's "fraudulent and deceptive act of changing a material condition of the lease without [Michael Adams's] consent or knowledge."

Following a bench trial, the court issued findings of fact and conclusions of law. The court found that as of October 1996, when Michael Adams signed the original lease, Michael Adams was justified in believing that the agreement he signed was identical to the third draft that he reviewed and that Alaska Rubber did not advise him that the right of first refusal in the third draft had been converted to an option to purchase. But the court found that the failure of Alaska Rubber to advise Michael Adams of the change was not "an attempt to deceive Michael Adams in any way." As to Higgins, the court found that she "was not involved in the negotiations other than to act as an intermediary between the principals." As to Don Adams, the court found that he "was justified in believing that an option to purchase was consistent with the prior negotiations between the parties" as reflected in part in the letter of August 2, 1996, and that both he and Higgins "were justified in assuming that Michael Adams would read the final version of the lease before signing it."

With respect to the original lease the court found that there was a material misunderstanding as to the option agreement and that no contract was formed. The court wrote:

> In *Salmine v. Knagin,* 645 P.2d 148, 150–151, the Alaska Supreme Court recognized that a material misunderstanding among the parties may prevent the formation of any contract. This may occur if the parties meant materially different things and neither knew or had reason to know of the other's meaning, of if each knew and had reason to know of the other's meaning. *Id.; See* Restatement (Second) of Contracts § 20. I conclude that this is what occurred when the lease agreement dated October 1, 1996 was executed. At that time Don Adams reasonably believed that the agreement contained an option to purchase while Michael Adams reasonably believed that the contract contained a right of first refusal. Neither party knew or

---

7. The lease extension provides as follows:
    This letter is in reference to that certain lease agreement with the above parties dated 1 October 1996, Lease premises being 5773 Old Seward Highway and further described in the original lease between the parties.
    Please be advised that your lease has been extended for an additional two years ending 1 October 2001. All conditions of the original lease shall apply without changes and shall remain in full force and effect.
    The concerned parties have agreed to this extension and affixed their respective signatures.

had reason to know the meaning attached by the other. When [the lease] originally was executed there was a material misunderstanding between the parties and hence no contract was formed.

The court then turned to the question of the validity of the lease extension of August 30, 1999. The court found that the extension was valid and that Michael Adams, by agreeing to the extension, affirmed the terms of the original lease as written. The court stated:

> Based on my finding that there were discussions concerning the option to purchase prior to the execution of the lease extension (which finding is based in large part on my finding that Mrs. Higgins is a credible witness on this issue) I conclude that there was no longer a misunderstanding between the parties when the lease extension was executed. The lease agreement that was extended clearly indicates that Don Adams has an option to purchase the property for $300,000.00. Michael Adams had reason to know that plaintiffs believed that they had an option to purchase the property. A review of the agreement he had signed in 1996 would have confirmed this. On the other hand, Don Adams and Mrs. Higgins only knew that Michael Adams had indicated he would look into whether or not there was an option to purchase prior to sending the lease extension to Mrs. Higgins. Restatement (Second) of Contracts Section 20 indicates that:
>
> > (2) The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if:
> >
> > (a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or
> >
> > (b) that party has no reason to know of any different meaning attached by the other, and the other has reason

to know the meaning attached by the first party.

*Id.; see also Salmine,* 645 P.2d at 151 n. 10. I conclude, therefore, that when the lease extension was executed in 1999 there was mutual assent. A valid contract existed at that time including an unambiguous option to purchase clause as specified in Paragraph 39 of the original lease agreement. Michael Adams has breached that agreement by refusing to sell the property to Don Adams.

The court thus decided that specific performance was appropriate. Initially the court concluded that the property excepted from the lease occupied by Michael Adams was not included in the option to purchase. Michael Adams filed a motion for reconsideration. One ground for the motion was that the contemplated decree of specific performance would require Michael Adams to create an illegal subdivision since the property that was excepted from the lease was not platted as a separate lot. The court generally denied Michael Adams's motion for reconsideration but decided that the excepted property was not intended to be excepted from the option or right-of-first-refusal clause. The court stated:

> I thus conclude that while the parties intended to exclude a portion of the property from the lease, this exclusion was intended to operate only while the property was leased and was not intended to affect the sale of the property. The sale of the property was intended to be for the entire parcel of property without exclusion.

The court thereupon ordered Michael Adams to convey the entire property including the property that was excepted from the lease.

Michael Adams appeals.

## II. DISCUSSION

### A. Standard of Review

▆▆▆ Leases are contracts that are reviewed according to the principles of contract interpretation.[8] Issues of contract interpretation are reviewed de novo.[9] Findings of

---

**8.** *Rockstad v. Global Finance & Inv. Co.,* 41 P.3d 583, 586 (Alaska 2002).

**9.** *Id.*

fact made by a trial court, including those that "provide a factual basis for its interpretation of a contract," [10] are reviewed deferentially under a clearly erroneous standard. A finding of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that the trial court has made a mistake.[11]

## B. Changing the Final Version of the Lease Was a Constructive Fraud.

■ Michael Adams argues that Alaska Rubber cannot obtain specific performance because its conduct, changing the terms of the final lease without notifying Michael Adams of the change, was fraudulent as a matter of law. Alaska Rubber counters that the court's findings that Alaska Rubber did not attempt to deceive Michael Adams effectively negate his argument that fraud was involved. For the reasons that follow, we conclude that Alaska Rubber's conduct with respect to the original lease was a constructive fraud.

Michael Adams relies on *Pierce v. Pierce,* a case in which we strongly disapproved of a party's act of adding an unagreed-to provision to a document without notice to the other party.[12] *Pierce* was a divorce case in which the parties participated in a settlement conference during which they reached agreement on all issues of child custody, child support, and property division.[13] The subject of which party would receive a child support tax credit was not discussed during the settlement conference.[14] After the settlement conference, the husband's counsel was designated to draft a child custody and support order memorializing the settlement agreement.[15] He inserted a provision in the draft order giving a fifty percent child support credit to the husband.[16] This had not been agreed to in the settlement.[17] The draft order was forwarded to the wife's counsel for review without calling attention to the new term.[18] The wife's counsel reviewed and approved the document, overlooking the newly added term. The court signed the order as prepared and approved.[19] Subsequently the wife discovered the new term and moved for relief from the order.[20] The trial court granted this motion and issued an amended order deleting the provision that husband's counsel had added.[21] On appeal we affirmed.[22] Although this was not the basis for the superior court's action, we ruled that the order should have been set aside under Civil Rule 60(b)(3) which provides relief from judgment for "fraud, ... misrepresentation, or other misconduct of an adverse party." [23] We held that the action of husband's counsel of adding the term without notifying the opposing party was misconduct within the meaning of Rule 60(b)(3):

> Insertion of a new term without informing [wife] or the court amounts to an attempt to gain a concession that was not bargained for. Insertion of the credit ... was neither an honest mistake nor a legitimate extension of negotiations, as the settlement was already complete when [husband] added the new term. If [husband] wished to add to the agreement a new term that had not previously been negotiated, his counsel had the obligation to bring the requested change to the attention of [wife's] attorney. This [husband's] counsel failed to do. Rule 60(b)(3) gives the court the authority to remedy such misconduct by a party or an attorney. In fact, the court has a duty to

10. *Id.;* Alaska R. Civ. P. 52(a).

11. *Dingeman v. Dingeman,* 865 P.2d 94, 96 (Alaska 1993).

12. 949 P.2d 498, 500 (Alaska 1997).

13. *Id.* at 499.

14. *Id.* at 500.

15. *Id.* at 499.

16. *Id.*

17. *Id.*

18. *Id.*

19. *Id.*

20. *Id.*

21. *Id.* at 499–500.

22. *Id.* at 501.

23. *Id.* at 500.

rectify such a wrong to protect the integrity of the judicial process.[24]

The policy expressed in *Pierce* condemning the surreptitious expression of new terms in the process of negotiations applies here. The conduct in this case is, if anything, more blameworthy than that in *Pierce* because the new language in *Pierce* was not miscaptioned and it did not contradict a clause in an earlier draft. Here, the option was inserted in a paragraph that addressed, according to its caption, a right of first refusal. Further, the option conflicted with earlier drafts that the parties had exchanged, including the third draft that was prepared by Alaska Rubber's counsel.

The trial court's reasons for concluding that Alaska Rubber was justified in not calling attention to the change to Michael Adams are insufficient. As noted there are three reasons. First, Higgins was merely an intermediary; second, Don Adams believed that an option to purchase was consistent with the prior negotiations between the parties; and third, Don Adams and Higgins thought Michael Adams would read the final version before signing it.[25] While Don Adams may have thought that an option to purchase was consistent with prior negotiations between the parties, that does not account for the fact that the parties' recent negotiations had focused on drafts containing a right of first refusal, not an option, including the most recent draft that was prepared by Alaska Rubber's counsel. Further, while it is possible that each of the actors for Alaska Rubber—Don Adams, Higgins, and Viergutz—might have believed that others would call attention to the change to Michael Adams, the fact remains that no one did so. Moreover, it is not a sufficient excuse for one party to say that it believed that the other party would review a final document and notice an unannounced change. Making unannounced changes, as *Pierce* teaches, is inherently deceptive and wrongful.

■ Fraud may be actual or constructive. "Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated,—that is, in which such conduct is a constructive ... fraud, having all the actual consequences and all the legal effects of actual fraud." [26] Stated otherwise, constructive fraud is a breach of a duty, which while not intentionally deceptive or actually dishonest, "the law declares fraudulent because of its tendency to deceive others." [27]

Alaska Rubber's conduct here was a constructive fraud. While neither Higgins, nor Don Adams, nor Viergutz, may have intended to deceive Michael Adams, the failure of Alaska Rubber to notify Michael Adams of the change had the same effect as an intentional deception. Viewed corporately, Alaska Rubber "had the obligation to bring the ... change to the attention of" Michael Adams.[28] Its breach of this duty was a constructive fraud because of the powerful tendency to deceive that such conduct carries with it.

C. **The Right To Avoid a Contract that Is Voidable Because of Fraud Is Lost Only by a Knowing Affirmance.**

■ To use the terms of the Restatement (Second) of Contracts, Alaska Rubber's act of changing the right-of-first-refusal clause to an option without changing the caption and without notifying Michael Adams was a misrepresentation—an express and implied assertion that the right-of-first-refusal clause in the third draft was unchanged.[29] The misrepresentation was material [30] and for the reasons discussed in the preceding section of this opinion, we consider it to have all the effects of actual fraud. But since Michael

---

24. *Id.*

25. *Supra* at page 747.

26. *In re Arbuckle's Estate,* 98 Cal.App.2d 562, 220 P.2d 950, 954–55 (1950).

27. *Knight v. Day,* 343 Ark. 402, 36 S.W.3d 300, 303 (2001); *see also Patel v. OMH Med. Ctr., Inc.,* 987 P.2d 1185, 1199 (Okla.1999).

28. *Pierce,* 949 P.2d at 500.

29. RESTATEMENT (SECOND) OF CONTRACTS § 159 (1981).

30. *Id.* at § 162.

Adams had a reasonable opportunity to read the lease before he signed it, his apparent assent to the lease was effective, and the lease was voidable rather than void.[31]

Two illustrations to section 163 of the Restatement come close to the facts of this case. Illustration 2 states:

> A and B reach an understanding that they will execute a written contract containing terms on which they have agreed. It is properly prepared and is read by B, but A substitutes a writing containing essential terms that are different from those agreed upon and thereby induces B to sign it in the belief that it is the one he has read. B's apparent manifestation of assent is not effective.

Illustration 3 states:

> A and B reach an understanding that they will execute a written contract containing terms on which they have agreed. A prepares a writing containing essential terms that are different from those agreed upon and induces B to sign it by telling him that it contains the terms agreed upon and that it is not necessary for him to read it. B's apparent manifestation of assent is effective if B had a reasonable opportunity to read the writing. However, the contract is voidable by B under the rule stated in § 164.... In the alternative, at the request of B, the court will decree that the writing be reformed to conform to their understanding under the rule stated in § 166.

The main difference between the two illustrations is that the recipient of the misrepresentation had a reasonable opportunity to read the writing in Illustration 3. As Michael Adams had a reasonable opportunity to read the lease in the final form before he signed it, Illustration 3 is more analogous to the situation in the present case. The lease was voidable by Michael Adams, but not void.

The main question in this case is whether Michael Adams lost his power of avoidance by extending the lease. The exercise of the power of avoidance is subject to the limitations expressed in chapter 16 of the Restatement.[32] Section 380(2) deals with the loss of the power of avoidance by affirmance. It provides that a party's power of avoidance for misrepresentation is not lost "until he knows of the misrepresentation if it is fraudulent, or knows or ought to know of a nonfraudulent misrepresentation...."[33]

Michael Adams's extension of the lease was a manifestation of "a willingness to go on with the contract" and was thus an "affirmance."[34] But the superior court did not find that Michael Adams actually knew that the original lease contained an option rather than a right of first refusal, only that he "had reason to know that [Alaska Rubber] believed that they had an option to purchase the property. A review of the agreement that he had signed in 1996 would have confirmed this."

For Michael Adams to lose his power of avoidance, a finding of actual knowledge of the misrepresentation, rather than reason to know of it, is necessary. Thus, remand is required. On remand, the court should make findings as to whether Michael Adams had actual knowledge that the lease contained an option when he agreed to extend it.

### D. Changing the Property Description Requires Reformation.

The only property description in the lease excepted from the lease is a parcel straddling two of the four lots. Michael Adams lives and stores personal property on this parcel. Although the court initially concluded that the excepted property was not included in

---

31. *Id.* at §§ 163, 164.

32. *Id.* at § 164, cmt. a: "Even if the contract is voidable, exercise of the power of avoidance is subject to the limitations stated in Chapter 16 on remedies."

33. *Id.* at § 380, cmt. b. The black letter statement of § 380(2) is as follows:
    The power of a party to avoid a contract for mistake or misrepresentation is lost if after he knows or has reason to know of the mistake or of the misrepresentation if it is non-fraudulent or knows of the misrepresentation if it is fraudulent, he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance.

34. *Id.* at § 380, cmt. a.

the option, on reconsideration the court concluded "that the portion of the property that was excluded from the lease was not intended by the parties to be excluded from any eventual sale of the property." The court gave a number of reasons for this conclusion:

First, the evidence indicates that the purpose of excluding a portion of the property from the lease was to allow Michael Adams the opportunity to remain on the property *temporarily* until a sale of the property finally occurred. The testimony of the parties establishes that Michael Adams intended to move off the property when the property was sold and that Michael Adams was seeking to dispose of the entire property. The leasing of the property was intended to be a temporary measure until the sale of the property occurred. The appraisals that were done by the parties at trial all valued the entire parcel without reference to any excluded portion. Further, even under defendant's theory of the case that the agreement only gave Don Adams a right of first refusal, this right of first refusal would have to be exercised on the entire piece of property. Otherwise, even under defendant's theory the problem of illegality and violation of the Municipality's zoning ordinances would arise. I thus conclude that while the parties intended to exclude a portion of the property from the lease, this exclusion was intended to operate only while the property was leased and was not intended to affect the sale of the property. The sale of the property was intended to be for the entire parcel of property without exclusion.

 By including the excepted property in the option, the court reformed the only property description in the overall document.[35] Reformation of a contract is available when "the words of the writing do not correctly express the meaning that the parties agreed upon."[36] In *Voss v. Brooks*[37] we listed the circumstances under which reformation may be appropriate:

(1) mutual mistake of fact in which the deed, as written, does not conform to the prior agreement of the parties; (2) fraud by one party which causes the other party to be under a mistaken belief as to the contents of the deed; (3) duress by one party which deprives the other party of any true freedom of choice; (4) unilateral mistake by one party and fraudulent or inequitable conduct by the other party, especially where the latter party knew of the other's mistake and kept silent; and (5) mistake of law . . . . [38]

A party seeking reformation is required to prove the elements of reformation by clear and convincing evidence.[39]

In the present case the only circumstance that might justify reformation in favor of Alaska Rubber would be a mutual mistake of fact if the property description set out in the lease does not conform to the parties' agreement as to what was to be sold. The court's findings on reconsideration as quoted above suggest a mutual mistake rationale. But they are not based on a clear and convincing standard of proof. On remand, if the court decides that Michael Adams has lost his right to avoid the lease and that specific performance is appropriate, the court should explicitly address whether grounds for reformation of the property description as to the option are present, and if so, whether the clear and convincing evidence standard has been satisfied.

## III. CONCLUSION

A remand is necessary for additional findings as described above. The court should hold a supplemental evidentiary proceeding if it believes that such a proceeding would be useful or necessary to its decision. For the reasons stated the judgment of the superior court is VACATED and the case is RE-

---

**35.** The court did so explicitly in the final judgment by deleting the language in the lease describing the excepted property.

**36.** Arthur L. Corbin, 7 Corbin on Contracts § 28.45, at 281 (2002).

**37.** 907 P.2d 465 (Alaska 1995).

**38.** *Id.* at 468.

**39.** *Id.*

MANDED for further proceedings in accordance with this opinion.[40]

CARPENETI, Justice, with whom EASTAUGH, Justice, joins, dissenting.

CARPENETI, Justice, with whom EASTAUGH, Justice, joins, dissenting.

*Introduction*

Michael Adams offered to sell his property to Don Adams either directly or through a lease with an option to purchase. The parties, who are unrelated, subsequently signed a lease with an option to purchase, although Michael Adams, who did not read the final document, believed it contained a right of first refusal. Near the end of the lease period, Don Adams gave notice of his intent to exercise the lease's option to purchase. Michael Adams insisted that the lease contained a right of first refusal, not an option to purchase. Told that it contained an option to purchase, he said that he would read the document. He subsequently extended the lease with an option to purchase by drafting and signing an extension and sending it to Don Adams.

Don Adams later notified Michael Adams again that he intended to exercise his option to purchase. When Michael Adams again refused to sell, insisting that the lease contained only a right of first refusal, Don Adams brought a complaint for specific performance. The superior court granted specific performance.

The superior court correctly decided the case based on the court's factual findings. Because those findings are not clearly erroneous, I respectfully dissent.

*Facts*

In October 1995 Michael Adams, who owned the property next to a lot owned by Alaska Rubber, wrote to Don Adams, the owner of Alaska Rubber, to offer his property for lease or sale. Michael Adams wrote, "I am writing to ask you if you are interested in leasing the premises or purchasing it. I am ready to go either way." He stated, "If you would be interested in purchasing the building I would like to have until July or sooner to move off the property." He referred to an earlier conversation between the two, mentioned that Don Adams had offered $300,000 for the property but stated that his price was $320,000, and closed with these admonitions as to his seriousness in offering the property for sale: "I am ready to dispose of the property.... The property is for sale and I will seriously consider an offer."

By August 1996 the parties had not reached an agreement. That month Michael Adams sent another letter to Don Adams. Noting that he sought a tax free trade, Michael Adams wrote, "[i]t appears a short term lease with you with a purchase option would be the way that will benefit me. Perhaps a two year lease with an option would be suitable." In the same letter Michael Adams stated, "Let's try for a three year lease at $3,000 per month and an opportunity to purchase the property during the lease period." Michael Adams then sent a lease form to Don Adams, but it did not contain an option to purchase. Instead, it contained a right of first refusal. Under the latter provision, Don Adams would be able to purchase the property only if Michael Adams decided to sell.

Don Adams sent the proposed agreement to his attorney, who changed only one section by adding a provision apportioning the costs of an environmental investigation (which would be necessary only in the event of a sale). The draft was sent to Michael Adams, who approved it and returned it to Don Adams for his signature. At this point, Don Adams noticed that the draft did not contain the option to purchase—which he believed the parties had earlier agreed upon—and he instructed his attorney to delete the right of first refusal and to insert the option to purchase. The attorney did so but, as the superior court found, "for reasons that were not established at trial [the attorney] failed to change the heading." Neither Don Adams nor anyone else on his behalf brought this change to the attention of Michael Adams,

---

**40.** Michael Adams has made a number of other contentions in connection with the remedy of specific performance and the inclusion of the excepted property in the option. We have reviewed these contentions and find them to be without merit.

who signed the agreement without reading it, believing it to be the same as the document he had previously sent to Don Adams. The superior court, after hearing all of the evidence, concluded that "this was not a deliberate attempt to mislead Michael Adams." The court based this conclusion on the testimony of Don Adams, who the court specifically found to be credible.

Almost three years later, as the lease was about to expire, the office manager for Alaska Rubber, Janeece Higgins, spoke with Michael Adams at the company picnic. She notified him that Don Adams was interested in exercising his option to purchase and therefore needed to initiate the environmental investigation before winter set in. Michael Adams indicated that he would get back to her. When he did not do so, she called him and again stated that Don Adams had decided to exercise the option to purchase. At this point, as the superior court found:

> Michael Adams indicated to her that he did not think he had to sell the property and Mrs. Higgins told him she disagreed. She told Michael Adams that while she did not have the lease in front of her she was pretty sure there was wording in the lease that gave Alaska Rubber & Supply an option to purchase. According to Mrs. Higgins, Michael Adams indicated that he would look into it and would get back to her.
>
> Thereafter, [Alaska Rubber] received a faxed lease extension from Michael Adams. The lease extension agreement was drafted and signed by Michael Adams and subsequently executed by Don Adams.... The lease extension agreement further indicated that "all conditions of the original lease shall apply without changes and shall remain in full force and effect."

The superior court made several findings that today's Opinion effectively ignores. The court found that Don Adams's testimony was "entirely credible." The court found that Don Adams's testimony was consistent with the initial correspondence between the parties regarding the sale of the property, and that it was consistent with the testimony of Janeece Higgins. The court also found Hig-

gins to be "fully credible." In addition, the superior court found the testimony of Michael Adams not to be credible, pointing to a number of factors, including that Michael Adams's letters uniformly referred to a sale and that negotiation of a purchase price in the letters is consistent with an option to purchase and inconsistent with a right of first refusal. In contrast to these strong findings, the Opinion merely notes that the superior court found that Don Adams "was justified in believing that an option to purchase was consistent with the prior negotiations between the parties," that the trial court "accepted Higgins's description of the events leading up to the lease extension," and that both Don Adams and Janeece Higgins were "justified in assuming that Michael Adams would read the final version of the lease before signing it."

Next, the superior court unambiguously found that "there was no longer a misunderstanding between the parties when the lease extension was executed." While today's Opinion mentions this finding in a long quotation of the superior court's decision, the Opinion ignores the finding in its discussion of whether Michael Adams affirmed the lease when he sent the lease extension to Don Adams.

But the most critical findings of the superior court, effectively ignored by today's Opinion in reaching its conclusion to remand, are the following:

> Michael Adams does not recall [the follow-up telephone conversation in which he and Higgins "discussed their differing views concerning whether or not the contract contained an option to purchase"] and indicates that he sent the lease extension to Alaska Rubber & Supply merely because the contract was to expire in another month. *He denies reading the lease agreement before sending the lease extension to Mrs. Higgins. I find Mrs. Higgins['s] testimony on the events leading to the execution of the lease extension to be fully credible. Conversely, I do not find Michael Adams['s] testimony on this issue to be credible.*

(Emphasis added.) In other words, the superior court found (1) that two conversations

took place between Higgins and Michael Adams in which Higgins stated that the lease contained an option to purchase (which Michael Adams denied)[1] and (2) that Michael Adams's testimony that he did not read the lease before signing the lease extension was not credible.

Today's result can be upheld only if Michael Adams had no obligation to read the lease on two occasions before signing, first when he signed the original lease under the mistaken belief that it contained a right of first refusal, and second when he signed the lease extension *after being told twice that it contained an option to purchase.* Because there is no reason to conclude that the superior court was clearly erroneous in any of its findings—indeed, I would go so far as to suggest that they are clearly correct, although that is not the standard of review to uphold factual findings—and because I cannot agree that a party may indefinitely refuse to read a document and be saved from his folly, I dissent from today's Opinion.

### Law

I have no quarrel with the proposition that it may constitute constructive fraud to change a final version of a lease without informing the other party of the change while leaving a misleading heading in place. But it is impossible to accept the propositions that there was not a "knowing affirmance" of the option to purchase by Michael Adams or that the superior court did not find a knowing affirmance. A careful review of the legal standard adopted by the court and the findings made by Judge Rindner show that there was a knowing affirmance and that Judge Rindner so found.

The court today adopts the Restatement standard. The Restatement provides: "The

power of a party to avoid a contract for … misrepresentation is lost if after [the party] … knows of the misrepresentation if it is fraudulent, he … acts with respect to anything he has received in a manner inconsistent with disaffirmance."[2] Accordingly, if Michael Adams extended the lease knowing that it contained an option to purchase, he lost the power to avoid the lease.

Generally a party acts "knowingly" not only when he or she possessed actual knowledge of a fact, but also when any failure to possess actual knowledge was due to the party's *deliberate ignorance or willful blindness in the face of the information presented to him or her.*[3] In *Louis Vuitton S.A. v. Lee,*[4] a trademark case requiring that the defendant's trademark violation be "knowing," the Seventh Circuit held that "willful blindness is knowledge enough."[5] The court found that the defendant did not know that he was selling counterfeit designer goods because the defendant "failed to inquire further because he was afraid of what the inquiry would yield."[6] Thus, the court found that Louis Vuitton had proved that the defendant had acted knowingly.[7]

The equation of willful blindness with actual knowledge has been found most frequently in criminal prosecutions, an area where the law has historically been extremely solicitous of the rights of the defendant. Interpreting the statutory definition of "knowingly," Alaska courts have held that "one who remains deliberately ignorant of an illegal activity" is necessarily "aware of a substantial probability of its existence," and so, acts "knowingly."[8]

Federal law is to the same effect. In *U.S. v. Picciandra*[9] the court held that a jury was properly instructed to consider the willful

---

1. *See infra* n. 16.

2. RESTATEMENT (SECOND) OF CONTRACTS § 380(2).

3. *See* Tal S. Benschar et al., *Proving Willfulness in Trademark Counterfeiting Cases,* 27 COLUM.-VLA J.L. & ARTS 121, 123–25 (2003); Ira P. Robbins, *The Ostrich Instruction: Deliberate Ignorance as a Criminal Mens Rea,* 81 J.CRIM. L. & CRIMINOLOGY 191, 192 (1990).

4. 875 F.2d 584 (7th Cir.1989).

5. *Id.* at 590.

6. *Id.*

7. *Id.*

8. *Dawson v. State,* 894 P.2d 672, 678 (Alaska App.1995).

9. 788 F.2d 39 (1st Cir.1986).

blindness of a defendant who claimed a lack of knowledge as part of his defense, where the facts suggested that he engaged in a conscious course of deliberate ignorance.[10] The Ninth Circuit has similarly held that a defendant's deliberate ignorance of a fact cannot serve as a shield against prosecution under statutes requiring actual knowledge. In *U.S. v. Jewell*[11] the court agreed that " '[t]he rule that willful blindness is equivalent to knowledge is essential.' " [12] The court cautioned that this rule did not adopt a negligence standard, whereby knowledge is imputed to a defendant if a reasonable person would have known of the fact in that situation. Rather, willful blindness is limited to circumstances where the party's studied ignorance is a result of not wanting to confirm his or her suspicion of a fact he or she knows is highly likely to be true.[13] The Ninth Circuit rule is that willful blindness may be equated to actual knowledge in cases where the facts point to the defendant's deliberate ignorance, where it can be shown that the defendant was aware of a high probability of the existence of the fact in question, and the defendant cannot show that he actually believed that the fact did not exist.[14] The Fifth and Eleventh Circuits have adopted similar reasoning.[15]

Examination of the testimony at trial in the present case and Judge Rindner's findings concerning the evidence leads inescapably to the conclusion that Michael Adams either actually knew that the lease contained an option to purchase or was willfully blind as to the lease's contents.

As to actual knowledge, at trial Michael Adams denied that he had spoken with Janeece Higgins about Don Adams wanting to exercise the option to purchase, denied that he had spoken to her about the environmen-

tal investigation, denied that he had spoken with her about a lease extension, and even denied that he had read the lease before sending the lease extension. He was asked, "Prior to sending Don Adams and Janeece Higgins the lease extension . . . you read the lease agreement, didn't you?" He responded, "I did not." Judge Rindner found Michael Adams's testimony concerning the events leading to the lease extension to be not credible. Although much of Michael's testimony focused on his conversation with Janeece Higgins, the scope of the finding that Michael Adams was not credible specifically includes his testimony at trial that he did not read the lease agreement before sending out the extension. Judge Rindner's disbelief of Michael Adams's statement that he did not read the lease before sending the extension, in conjunction with his acceptance of Higgins's testimony that she had discussed the matter twice with Michael Adams,[16] is the equivalent of a finding that Michael Adams had actual knowledge of the lease's terms. Indeed, Judge Rindner specifically found that "there was no longer a misunderstanding between the parties when the lease extension was executed."

As to willful blindness, the superior court had abundant evidence to support its conclusion that, at the least, Michael Adams kept himself willfully blind of the contents of the lease. That evidence included that:

- The lease does contain an option to purchase. No party disputes that.

- Janeece Higgins testified that she told Michael Adams in person that the lease contained an option to purchase. The superior court found her to be credible on this point.

- Michael Adams testified that he did not remember being told that the lease con-

---

**10.** *Id.* at 46.

**11.** 532 F.2d 697 (9th Cir.1976).

**12.** *Id.* at 700 (quoting G. WILLIAMS, CRIMINAL LAW: THE GENERAL PART, § 57 at 157 (2d ed.1961)).

**13.** *Id.* at 700 n. 7.

**14.** *See U.S. v. Alvarado*, 838 F.2d 311, 314 (9th Cir.1987); *U.S. v. Murrieta–Bejarano*, 552 F.2d 1323, 1325 (9th Cir.1977).

**15.** *U.S. v. Batencort*, 592 F.2d 916, 918 (5th Cir. 1979); *U.S. v. Aleman*, 728 F.2d 492, 494 (11th Cir.1984).

**16.** Higgins testified that she twice had conversations in which she stated that the lease contained an option to purchase which Don Adams wished to exercise, and that Michael Adams expressed disbelief that the lease contained such an option.

tained an option to purchase. The superior court found him not to be credible on this point.

- Janeece Higgins testified that she called and reiterated that the lease contained an option to purchase. The superior court found this testimony to be credible.
- Michael Adams testified that he did not recall the telephone call. The superior court found this testimony not to be credible.
- Michael Adams prepared, signed, and sent to Don Adams an extension of the lease that provided that "[a]ll conditions of the original lease shall apply without changes."

These facts, found by the superior court and not rejected by today's Opinion as clearly erroneous—nor could they be—firmly establish that Michael Adams at the least kept himself deliberately ignorant of the contents of the lease and was willfully blind to the fact that it contained an option to purchase.

### Conclusion

Michael Adams proposed to sell his property under a lease with an option to purchase. He twice signed documents to that effect. Yet the court today remands for a determination, in effect, of whether he *ever* read the documents he signed, even after he promised to check the lease when a dispute arose as to what it contained. (Indeed, this is not the first time that Michael Adams has been before this court arguing that he was not required to do what he had previously agreed to do: sell property that he had leased with an option to purchase.[17]) Judge Rindner properly found that Michael Adams knowingly affirmed the contract. Judge Rindner was correct, and I would affirm his decision. Michael Adams should not escape the obligation that he had originally suggested and twice agreed to. For these reasons, I respectfully dissent.

---

17. *Adams v. Waddell,* 543 P.2d 215 (Alaska 1975).