Michael A. ADAMS, Appellant,

v.

Don ADAMS, Individually and on behalf of Alaska Rubber & Supply, Inc., and ADA Investments, Appellees.

No. S–11716.

Supreme Court of Alaska.

Feb. 24, 2006.

Rehearing Denied April 11, 2006.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Michael Adams, the lessor of real property, sent his lessee a signed extension for a lease that gave the lessee an option to purchase. The clause was unenforceable unless Michael Adams actually knew of the option to purchase when he sent the lessee the signed lease extension. We conclude that the superior court did not clearly err in finding that Michael Adams had actual knowledge; we therefore affirm the order that the property be conveyed to the lessee, Don Adams.

Because there was clear and convincing supporting evidence, we also affirm the superior court's reformation of the lease, making the entire property subject to the purchase option. But we agree with Michael Adams that he should have been awarded interest. We therefore remand with instructions to amend the judgment accordingly. We reject Michael Adams's contention that Don Adams's attorney's fee award should be reduced.

## II. FACTS AND PROCEEDINGS

This is the second time this matter has come before us. Because the facts were set out in detail in *Adams v. Adams*,[1] we only briefly recount them here to set the stage for this appeal. In 1996 Michael Adams agreed to lease property to Alaska Rubber & Supply, Inc. and to Alaska Rubber's principal, Don Adams (no relation to Michael).[2] After several exchanges of draft leases, Don Adams's attorney replaced a right-of-first-refusal provision with an option-to-purchase provision in the final draft of the proposed lease, but no one notified Michael Adams of the change. Michael Adams signed the lease without reading it. Approximately three years later, in August 1999, after discussing the terms of the signed lease twice with a

Steven D. Smith, Anchorage, for Appellant.

Wevley William Shea, Anchorage, for Appellees.

1. *Adams v. Adams* (*Adams I*), 89 P.3d 743 (Alaska 2004).

2. We will refer to Don Adams when referring to the lessees, unless context dictates otherwise.

representative of Don Adams, Michael Adams sent a signed lease extension to Don Adams. Shortly thereafter, Don Adams attempted to exercise the option to purchase, but Michael Adams refused to sell. Don Adams sued for specific performance. Michael Adams counterclaimed, arguing that the lease was void due to Alaska Rubber's fraudulent conduct.

Following trial, the superior court found that Michael Adams had reason to know that the lease contained an option to purchase when he sent the signed lease extension to Alaska Rubber. It also concluded that the parties intended that the entire property would be conveyed if a sale took place, including a portion that Michael Adams claimed was not subject to sale. Michael Adams appealed. In *Adams*, we remanded for two specific findings. We first requested "findings as to whether Michael Adams had actual knowledge that the lease contained an option [to purchase] when he agreed to extend it."[3] Assuming he did, we then instructed the superior court to "explicitly address whether grounds for reformation of the property description as to the option are present, and if so, whether the clear and convincing evidence standard has been satisfied."[4]

The superior court found on remand that Michael Adams did have actual knowledge of the option-to-purchase provision and that reformation was supported by clear and con-

vincing evidence. It entered an amended final judgment that ordered conveyance of the entire property and awarded interest and attorney's fees to Don Adams.

Michael Adams appeals.

## III. DISCUSSION

### A. Standard of Review

■ We review the superior court's factual findings for clear error.[5] A finding is clearly erroneous if it leaves us with a definite and firm conviction on the entire record that a mistake has been made.[6] Issues of lease interpretation are reviewed de novo.[7] Questions of law are also reviewed de novo.[8]

### B. The Superior Court's Finding of Actual Knowledge Was Not Clearly Erroneous.

Michael Adams argues that the record does not support the superior court's finding that he had actual knowledge that the lease contained the option-to-purchase provision before he sent the signed lease extension to Don Adams. We disagree.

At the outset, we note that actual knowledge can be inferred from circumstantial evidence.[9] Otherwise, it would be nearly impossible to establish actual knowledge in the context of a claim of fraudulent misrepresentation unless the affirming party admitted

---

**3.** *Adams I*, 89 P.3d at 751.

**4.** *Id.* at 752.

**5.** *Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 283 (Alaska 2004).

**6.** *Id.*

**7.** *Adams I*, 89 P.3d at 748.

**8.** *Catalina Yachts v. Pierce*, 105 P.3d 125, 128 (Alaska 2005).

**9.** *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Whether a prison official had [actual] knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."); *In re Su*, 290 F.3d 1140, 1146 n. 6 (9th Cir.2002) (bankruptcy court can consider circumstantial evi-

dence in determining whether debtor actually knew harm to creditor was substantially certain); *Ingalls v. Florio*, 968 F.Supp. 193, 199 (D.N.J. 1997) (actual knowledge of risk of harm can be inferred from circumstantial evidence of obviousness of risk); *Heigle v. Miller*, 332 Ark. 315, 965 S.W.2d 116, 120 (1998) (actual knowledge of hidden dangerous conditions can be shown by circumstantial evidence); *Yuzon v. Collins*, 116 Cal.App.4th 149, 10 Cal.Rptr.3d 18, 29 (2004) (landlord's actual knowledge of dangerous animal can be established by circumstantial evidence); *Benjamin v. Union Carbide Corp.*, 162 Md.App. 173, 873 A.2d 463, 476 (2005) (actual knowledge in context of discovery rule may be implied from circumstantial evidence), *cert. granted, Georgia–Pac. v. Benjamin*, 388 Md. 404, 879 A.2d 1086 (2005); *Etherton v. Doe*, 268 Va. 209, 597 S.E.2d 87, 89 (2004) ("[I]t is axiomatic that any fact that can be proved by direct evidence may be proved by circumstantial evidence.").

that it knew of the fraud.[10] In this case, Michael Adams did not admit that he knew the lease contained an option to purchase. But there was sufficient circumstantial evidence here for us to conclude that a finding of actual knowledge was not clearly erroneous.

The superior court noted that "Michael Adams certainly would have carefully reviewed the original lease prior to drafting, signing and sending the lease extension agreement to Don Adams." Michael Adams testified that he did not read the lease before sending the extension. When asked why, he responded: "I knew what the lease said.... After reading three [draft] leases in a row, I know exactly what it said, I didn't have to refresh my memory, I knew what it said.... I had no suspicion that it was changed...." He testified that it was not until he received a certified letter from Don Adams, approximately three months after he sent the lease extension, that he discovered that the lease contained an option to purchase. The superior court found this testimony to be "not credible" and rejected it. Because the superior court was in the best position to assess the demeanor and credibility of all the witnesses, we will follow our normal practice of "consistently grant[ing] deference to trial courts where credibility is at issue."[11]

The superior court noted that it was "inconceivable that Michael Adams would not have carefully reviewed [the lease]" after two conversations he had with Janeece Higgins, Alaska Rubber's general manager. The lease extension was sent on August 30, 1999. Higgins testified that she spoke with Michael Adams at a company picnic on August 13, 1999 and "told him that Don was interested in exercising his option to purchase." According to her testimony, Higgins telephoned Michael Adams shortly after the picnic and told him again that Don Adams wanted "to exercise his option to purchase." When Michael Adams stated that he did not think he had to sell the property, Higgins testified that she told him she was "pretty sure that there's wording in the lease that says you have—that we have the option to purchase" and that "you have to sell it to us." Michael Adams denied that the conversations with Higgins even took place. The superior court, however, found that Higgins's testimony was more credible.

We think that the conversations with Higgins were of "such a nature that one would reasonably anticipate" that the lease contained an option to purchase.[12] Michael Adams failed to provide a credible explanation for why these conversations did not provide him with actual knowledge; rather, he simply denied, unconvincingly to the trial court, that they ever occurred.[13]

■ As stated above, the superior court did not believe Michael Adams when he testi-

10. In the context of hit-and-run accidents, we observed: "It is rarely possible ... for the state to show that the accused actually knew that the injury had occurred and such knowledge must usually be proved by showing the surrounding facts and circumstances indicating such knowledge." *Kimoktoak v. State,* 584 P.2d 25, 32 (Alaska 1978).

11. *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles,* 20 P.3d 1130, 1136 (Alaska 2001); *see also* Alaska R. Civ. P. 52 ("[D]ue regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."); *Kohl v. Legoullon,* 936 P.2d 514, 518 n. 5 (Alaska 1997) ("The trial court is in the best position to assess the credibility of witnesses. To the extent there are conflicts in testimony, we normally defer to the superior court's resolution of such factual disputes."); *Crook v. Mortenson–Neal,* 727 P.2d 297, 306 (Alaska 1986) ("[T]he superior court was in the best position to evaluate the defendants' demeanor and credibility. We, therefore, defer to the court's view.").

12. *Kimoktoak,* 584 P.2d at 32 (holding that criminal liability attaches to hit-and-run driver "where the state can prove by direct or circumstantial evidence that the driver actually knew of the injury or that he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person").

13. *See Farmer,* 511 U.S. at 842, 843 n. 8, 114 S.Ct. 1970 (noting that obviousness of risk is sufficient to prove that prison official was conscious of risk but that such obviousness is not always conclusive because prison official can show that it escaped him or her); *see also Su,* 290 F.3d at 1146 n. 6 (noting that debtor has to deal with any evidence " 'which would indicate that he must have had a substantially certain belief that his act would injure, notwithstanding any subjective denial of such knowledge.' ") (quoting *Spokane Ry. Credit Union v. Endicott (In re Endicott),* 254 B.R. 471, 477 n. 9 (Bankr.D.Idaho 2000)).

fied that he was not aware of the provision until after he sent the lease extension. Moreover, the option-to-purchase provision was mentioned by Higgins in conversations with Michael Adams on two occasions. This circumstantial evidence, which Michael Adams failed to adequately refute, supports the superior court's credibility determination. We therefore conclude that it was not clear error to find that Michael Adams actually knew the lease contained an option to purchase.

## C. The Superior Court Did Not Clearly Err in Finding that Reformation Was Supported by Clear and Convincing Evidence.

 Michael Adams argues that the evidence relevant to reformation was not clear and convincing.[14] We have said that "[r]eformation of a contract is available when 'the words of the writing do not correctly express the meaning that the parties agreed upon.'"[15] Among other circumstances, reformation may be appropriate when there is a "'mutual mistake of fact.'"[16] The question here, then, is whether the superior court clearly erred in finding that there was clear and convincing evidence that the parties intended the entire property to be included in a sale.

The lease reserved a portion of the property for Michael Adams to use as his residence and for storage. But the lease did not specify whether this reserved portion would also be reserved if Don Adams exercised the option to purchase.[17] On remand the superior court found "by clear and convincing evidence that the portion of the property that was excluded from the lease was not intended by the parties to be excluded [from] any eventual sale of the property" and that "there was a mutual mistake of fact to the extent that the property description set out

in the lease did not conform to the parties['] agreement as to what was to be sold."

Michael Adams testified that the piece of property was "important" to him and that he "would never sell it." But our review of the record convinces us that the superior court was correct to afford this testimony little persuasive value. Most notable is the superior court's observation that the property appraisal commissioned by Michael Adams in preparation for trial "valued the entire parcel without reference to any excluded portion." Don Adams's complaint requested that Michael Adams be ordered to convey "the property" without any discussion of an excluded portion. Michael Adams's answer did not contest this request or assert that the reserved portion was to be excluded from sale. Had Michael Adams intended to exclude the reserved portion from sale, we think it likely that his property appraisal and answer would have addressed the reserved portion.

Other evidence supports the conclusion that Michael Adams intended to sell the entire property at the time the contract was formed. He initially offered to sell, rather than lease, the property to Don Adams. He wrote in an October 1995 letter to Don Adams that he intended to move off the property shortly after the sale was completed. Thus, as of October 1995, Michael Adams did not intend to exclude the reserved portion from sale. Almost a year later, in August 1996, Michael Adams again wrote to Don Adams and discussed leasing the property to him. This time there was no mention of moving off the property, but there was also no mention of reserving a portion from sale.

Michael Adams testified that his intentions changed between October 1995 and the initiation of negotiations between the parties in 1996. He testified that he learned the re-

---

14. *Adams I*, 89 P.3d at 752 (observing that elements of reformation must be supported by clear and convincing evidence).

15. *Id.* (quoting Arthur L. Corbin, 7 Corbin on Contracts § 28.45, at 281 (2002)).

16. *Voss v. Brooks*, 907 P.2d 465, 468 (Alaska 1995) (quoting 6A Richard R. Powell, Powell on Real Property ¶ 901[1][d], 81A–162–163).

17. Even when earlier drafts of the lease contained a right-of-first-refusal provision, the lease did not specify whether the reserved portion would be included if Don Adams exercised the right of first refusal. Therefore, the reformation question is independent of the dispute over whether Alaska Rubber had a right of first refusal or an option to purchase.

served portion was the only place he could keep his trailer because, although the property was zoned industrial, it was "grandfathered" while other parcels he owned were not. He testified that he told Janeece Higgins "here's your lease. This is where Alaska Rubber is, this is where you stay and this is where I stay and I'm staying there because I'm going to stay here." But Michael did not testify whether he specified to her that this intent applied to a sale as well as a lease.

The testimony of Janeece Higgins and Don Adams, which the superior court found to be "fully credible," supports a finding that Michael Adams intended to stay on the reserved portion during the lease but not that he intended to exclude it from sale. Both Higgins and Don Adams testified that Michael Adams never communicated to Alaska Rubber any intent to reserve the excluded portion from sale. Higgins was asked whether at any time Michael Adams "indicate[d] that he was going to do anything other than move off the property when [Don] Adams exercised the option to purchase"; and she answered "no, he did not." Don Adams testified that he "knew that we were going to let [Michael Adams] stay there in his trailer where he lived during the term of the lease." But Don Adams also testified that his "understanding" was that he "would be purchasing the property, period," and that "[t]here was never any other discussion. As [Michael Adams's] letter stated, he was willing to sell and he had a place to move to."

The superior court did not clearly err in finding that there was clear and convincing evidence that Michael Adams intended to convey the entire property and to vacate the reserved portion if and when it was sold. Michael Adams commissioned a property appraisal that made no mention of reserving a portion from sale. His answer and counterclaim similarly did not refer to any such

exclusion. It was only after the superior court itself raised the issue that Michael Adams took the position that he did not intend for the reserved portion to be sold.[18] We therefore affirm the reformation of the lease.

### D. Michael Adams Should Have Been Awarded Interest.

Michael Adams argues that the court, having found that he was obliged to sell the property following Don Adams's attempt to exercise the option to purchase, erred by not awarding interest to him on the amounts Don Adams had to pay to buy the property. The amended final judgment selected May 1, 2000 as the date the property would have been purchased had Michael Adams not refused to sell. The superior court awarded interest to Don Adams on the award of one-half the environmental phase two assessment, the rental payments made since May 1, 2000,[19] and attorney's fees and costs. Michael Adams asserts that he should have been awarded interest on the $30,000 earnest money payment that would have been due on or about February 1, 2000 and on the $270,000 balance of the purchase price that would have been due on May 1, 2000. According to the lease, the balance was to have been paid within ninety days of the earnest money agreement. Therefore, February 1, 2000 is approximately the latest the earnest money could have been paid to accomplish a May 1, 2000 purchase.

■ We have stated that "[w]here the vendee has retained possession, ... the vendor is entitled to interest on the unpaid purchase money, even if the delay in performance of the contract is attributable to the vendor."[20] The reason for this rule is that, because we are "attempting to enforce the contract as written," we "will attempt to place the parties in the position they would have been in had the contract been per-

---

18. The superior court stated at trial that it noticed that a portion of land was excluded from the lease and that whether it was "to be purchased or not ... [is] a question that's arisen in my mind." The court suggested that the parties might want to produce some testimony on the topic if the issue was going to be a "fight" between them.

19. Alaska Rubber apparently stopped making rental payments when the superior court issued the initial final judgment in June 2001.

20. *Dillingham Commercial Co. v. Spears*, 641 P.2d 1, 10 (Alaska 1982).

formed in a timely manner."[21] Michael Adams, therefore, should have been awarded interest. We remand for adjustment of the amended final judgment accordingly.

### E. Don Adams's Award of Attorney's Fees Should Not Be Reduced.

Michael Adams argues that Don Adams should not have been reimbursed for attorney's fees related to the superior court's reformation of the lease. Paragraph 15 of the lease provides:

> In the event either party shall be in material default in the performance of any of their obligations under this Lease and costs and attorney's fees are incurred by the non defaulting party in enforcement of this Lease or in an action for eviction or damages, or otherwise, the defaulting party shall pay to the other all the expenses incurred therefore, including reasonable costs and attorney's fees.

Michael Adams suggests that reformation of the lease is not an enforcement of the lease and that paragraph 15 should not apply.

The Utah Supreme Court addressed a similar situation involving a provision similar to paragraph 15 in *Jensen v. Manila Corp. of the Church of Jesus Christ of Latter–Day Saints*.[22] The plaintiff there sued to reform a real estate contract that incorrectly described the size of the property that was to be sold.[23] The plaintiff successfully argued that the written instrument did not reflect "the bargain the parties previously orally agreed upon."[24] The court reasoned that the plaintiff "pursued a proper remedy to obtain possession of the premises encompassed within the bargain previously agreed upon. That bargain is part of the subject matter of the contract allowing recovery of attorney fees."[25]

 In this case, there was clear and convincing evidence that Michael Adams had agreed to sell the entire property.[26] Although the lease itself did not explicitly reflect that agreement, Michael Adams was in "material default in the performance of [one] of [his] obligations" when he took the position that something less than the entire property was to be sold. He is therefore liable for reasonable attorney's fees that Don Adams incurred as a result of enforcing the parties agreement that the entire property be sold.[27]

## IV. CONCLUSION

For these reasons, we AFFIRM the order of specific performance and the reformation of the lease. We REMAND for adjustment of the judgment in accordance with our discussion of interest.

---

21. *Id.*

22. *Jensen v. Manila Corp. of the Church of Jesus Christ of Latter–Day Saints*, 565 P.2d 63, 64 (Utah 1977).

> The attorney's fee provision in *Jensen* stated:
> Buyer and Seller each agree that should they default in any of the covenants or agreements contained herein, that the defaulting party shall pay all costs and expenses, including a reasonable attorney's fee, which may arise or accrue from the enforcement of this agreement, or in obtaining the possession of the premises covered hereby, or in pursuing any remedy provided hereunder by the statutes of the State of Utah, such remedy is pursued by filing of a suit or otherwise.
> *Id.* at 65.

23. *Id.*

24. *Id.* at 64.

25. *Id.* at 65.

26. *See supra* Part III.C.

27. Our conclusion does not conflict with our dicta in *Gamble v. Northstore Partnership*, 28 P.3d 286 (Alaska 2001). We there stated that, for purposes of a similar clause concerning attorney's fees,

> [a]rguably there is a difference between a suit to enforce an ... agreement and a suit to reform such an agreement. An enforcement suit presupposes an alleged violation of the agreement. The court must then determine whether such a violation has occurred. By contrast a reformation suit does not necessarily involve a violation.

*Id.* at 289. But in the present case the superior court did not merely reform the lease. By finding that Don Adams is entitled to specific performance under the reformed lease, the superior court effectively found that Michael Adams had violated the lease by refusing to sell the entire property. This case therefore differs from the example we referred to in *Gamble*.