Ronald D. ROCKSTAD, and White Swan, Inc., d/b/a Plaza Cleaners, Appellants,

v.

GLOBAL FINANCE & INVESTMENT COMPANY, INC., an Alaska corporation, Appellee.

No. S–9579.

Supreme Court of Alaska.

Feb. 1, 2002.

Zane D. Wilson, Cassandra Tilly, and Mila Leonard, Cook Schuhmann & Groseclose, Inc., Fairbanks, for Appellants.

Michael Stephan McLaughlin, Guess & Rudd P.C., Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

Ronald Rockstad failed to pay his business's rent on time; his landlord terminated the lease and sued for eviction. Finding that Rockstad had committed a technical default by failing to pay timely rent but that the default was not material since Rockstad had tendered late payment minutes after the usual deadline, the superior court declined to order eviction, but nonetheless directed Rockstad to reimburse his landlord's costs of litigation. Rockstad appeals, challenging the finding of default and the resulting cost order. We reverse, holding that, under the applicable terms of the lease, Rockstad avoided default by tendering late payment before his landlord issued a written notice of termination.

## II. FACTS AND PROCEEDINGS

Ronald D. Rockstad operates a dry cleaning and laundry business, White Swan, Inc., d/b/a Plaza Laundry and Cleaners, on commercial property in the Washington Plaza Mall in Fairbanks that Rockstad leases from Global Finance and Investment Company, Inc. Rockstad made monthly payments for rent and utilities to Global's counsel, James DeWitt, at the Fairbanks branch of DeWitt's law firm, Guess & Rudd P.C. The firm's regular business hours are from 8:00 a.m. to 5:00 p.m. Although the lease provides that rent is due on the first day of each month, DeWitt commonly accepted payments tendered by Rockstad on or before the tenth day of the month.

Rockstad encountered problems making timely payments to Global during two consecutive months in 1999. In August 1999 he neglected to make a timely utility payment and failed to tender the amount due for more than ten days after Global sent him written notice of the deficiency. We assume that Rockstad's late payment amounted to a default under the lease.[1]

The following month, Rockstad waited until the afternoon of September 10 to deliver his rent. He arrived at DeWitt's office at approximately 5:10 p.m.; by then, the office had already closed for the day.

September 10 was a Friday. At some point during the ensuing weekend, Rockstad left a message on DeWitt's answering machine, explaining that "he tried to deliver the rent after 5:00, that he wanted to deliver the rent." After listening to this message on Monday, September 13, DeWitt called Rockstad's office and left a message that Global would refuse his late payment. Later that day, DeWitt sent Rockstad a notice directing him to vacate the premises immediately. The notice explained that, because Rockstad's failure to pay timely rent was his second default in two months, Global had decided to exercise its power under the Renewed Default clause of the lease to decline any tender of cure and to terminate Rockstad's option to renew or extend the lease.

Rockstad refused to vacate. In October, Global filed a Complaint for Forcible Entry and Detainer and Monies Due. Superior Court Judge Ralph R. Beistline held a non-jury trial on Global's complaint. Judge Beistline concluded that Rockstad had violat-

---

1. Although Rockstad's opening brief argues that the late utility payment was not a default, his reply brief does not address the point. At oral argument, Rockstad's counsel confirmed that Rockstad does not dispute that the late payment in August amounted to a default. Because Rockstad now concedes this issue, and because we find no second default, we need not consider whether Rockstad committed a first default.

ed the terms of the lease by failing to pay his September rent on time and that, under the lease's renewed-default provision, this violation amounted to Rockstad's second default in a two-month period and technically entitled Global to terminate the lease. But the judge went on to conclude that Rockstad's breach was not material, since Rockstad had tendered payment within minutes of the parties' customary deadline.[2] The judge ruled that he would decline to evict Rockstad "if Rockstad makes good the late rent, plus interest, plus the reasonable costs of these proceedings."

Rockstad appeals.

## III. DISCUSSION

### A. Relevant Lease Provisions

The dispute in this case centers on subsection 15.4 of Rockstad's lease, which deals with "renewed defaults." This provision must be interpreted in light of other relevant lease provisions—provisions dealing with rent, defaults, and remedies in the event of default. We thus begin our discussion by summarizing the relevant lease provisions.

#### 1. Lease provisions dealing with rent

Section 4 of the lease consists of two subsections dealing with rent. Subsection 4.1 sets the minimum monthly rents, specifies that the rent is "payable in advance, on the first (1st) day of each month," and requires the rent to be paid "without notice or demand ... to [the] Landlord." Subsection 4.2 establishes late charges. Under this section overdue rent incurs no penalty for the first ten days; late charges and interest then begin to apply:

4.2 *Late Charge.* If any [rent] payment is not paid within ten (10) days of the due date, then there shall be added as additional rent an amount equal to Four percent (4%) of the delinquent payment for the month or portion thereof after the date it was due, *provided, however,* if such sum and late charge are not paid in full on the tenth (10th) day of the month, such sum shall commence to bear interest at the rate of Ten and One–Half percent (10.5%) per annum until paid in full.

#### 2. Lease provisions defining defaults

Section 15 of the lease addresses defaults, declaring that "any one or more of the following events shall constitute a default and breach of this Lease by Tenant." The lease goes on to list four events that are defaults, two of which are relevant here.

Subsection 15.2 makes failure to pay overdue rent a default, but only if the landlord gives the tenant written notice of overdue rent and the tenant then fails to cure the deficiency within ten days:

15.2. *Failure to Pay Rent.* The failure by Tenant to make any payment of rent or any other payment required to be made by Tenant hereunder as and when due, where such failure shall continue for a period of ten (10) days after written notice thereof by Landlord to Tenant.[3]

Subsection 15.4 lists "renewed default" as another form of default, providing that a renewed default consists of

[t]he commission by Tenant of any default described [in subsections 15.1—15.3] a second time and within two (2) months following the time when Tenant has been given notice of such a default under *[Subs]ection 15.2 or [Subs]ection 15.3* and has cured the same within the permitted time.

The key elements of a "renewed default," then, are (1) a prior default that has been cured; and (2) a new default, as the term is

---

**2.** Specifically, Judge Beistline ruled:

The Court concludes that Rockstad did, in fact, breach the strict terms in the lease agreement and thus jeopardized the lease itself. However, given the fact that the parties' course of conduct permitted Rockstad a 10–day grace period, and further, given the fact that Rockstad was (apparently) only 10 minutes late in tendering the rent in question, the Court concludes that the breach involved was not suffi-

cient at this time to justify a termination of the lease, i.e. [,] under the specific facts of this case the breach was not material.

**3.** Subsection 15.3, which governs default for failure to perform lease covenants other than rent, is generally similar to subsection 15.2 but allows the tenant more flexibility in curing the failure of performance.

described in subsections 15.1—15.3, occurring within two months thereafter.

### 3. Lease provisions defining remedies for default

Lease section 16 covers remedies for defaults. Section 16 declares that, in the event of a default, the landlord may "at any time thereafter, in its sole discretion, with or without notice or demand and without limiting Landlord in the exercise of a right or remedy," exercise any right or remedy listed in subsections 16.1—16.3. Subsection 16.1 grants the right of immediate possession and to recover "all damages incurred by Landlord by reason of Tenant's default." Subsection 16.2 gives the landlord the option, in the event of a default by abandonment, to maintain the tenant's right to possession and enforce the terms of the lease. And subsection 16.3 broadly allows the landlord to pursue any other remedy available under the law.

### B. Standard of Review

■ It is well-settled that leases are contracts and should be interpreted according to contract principles.[4] Issues of contract interpretation generally present questions of law, which we review de novo.[5] But when the trial court relies on extrinsic testimonial evidence to provide a factual basis for its interpretation of a contract, we apply the clearly erroneous standard in reviewing the court's background findings of fact.[6]

■ In *Wessells v. State of Alaska, Department of Highways*, we described the two-step analysis that we apply in determining the meaning of lease terms.[7] First, we look to the language of the lease and extrinsic evidence to determine whether the lease is ambiguous.[8] Disagreement alone does not establish the existence of an ambiguity. As we explained in *Wessells*, "[a]n ambiguity exists only where the disputed terms are reasonably subject to differing interpretation after viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms." [9]

■ After determining whether the lease is ambiguous, we move on to the second step of the analysis. If the lease is clear and unambiguous, we construe it solely according to its written terms.[10] But if the lease's language is ambiguous, we apply well-established rules of contract interpretation and determine the reasonable expectations of the parties.[11] Three main principles inform the lease-interpretation process:

> First, ambiguities are construed against the party that supplied and drafted the form. . . . Second, ambiguities are construed against the lessor. Third, a construction of an ambiguous provision which permits the continued performance of a lease is favored.[12]

In applying these principles, we must strive to give effect and reasonable meaning to all provisions of the instrument.[13] And we also must attempt to interpret the terms of the lease harmoniously, avoiding those interpre-

---

**4.** *See* 49 Am.Jur.2d *Landlord and Tenant* § 43 (1995).

**5.** *See Leisnoi, Inc. v. Stratman*, 956 P.2d 452, 454 (Alaska 1998); *Norton v. Herron*, 677 P.2d 877, 880 (Alaska 1984).

**6.** *Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 122 (Alaska 1991) (citing *Ursin Seafoods v. Keener Packing Co.*, 741 P.2d 1175, 1178 (Alaska 1987)).

**7.** 562 P.2d 1042, 1046 (Alaska 1977) (citing *National Bank of Alaska v. J.B.L. & K. of Alaska, Inc.*, 546 P.2d 579, 584–86 (Alaska 1976)).

**8.** *Id.* at 1046; *see also Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 n. 1 (Alaska 1982) (stating that Alaska courts may "initially turn to extrinsic evidence when construing contracts").

**9.** *Wessells*, 562 P.2d at 1046; *see, e.g., Klosterman*, 821 P.2d at 122–23 & n. 6.

**10.** *Wessells*, 562 P.2d at 1046 & n. 10.

**11.** *Id.* at 1048; *see also Klosterman*, 821 P.2d at 124 (giving effect to parties' reasonable expectations when interpreting lease agreement).

**12.** *Wessells*, 562 P.2d at 1048 (footnotes and internal citations omitted); *see, e.g., Klosterman*, 821 P.2d at 122–23 & n. 6.

**13.** *Wessells*, 562 P.2d at 1049 n. 23 (citing *Modern Constr., Inc. v. Barce, Inc.*, 556 P.2d 528, 530 (Alaska 1976)).

tations that cause conflicts among the provisions.[14]

Bearing these principles in mind, we turn to the parties' arguments concerning the renewed-default provision.

## C. The Parties' Arguments Concerning Renewed Default

Global asserts that Rockstad's untimely August 1999 utility payment meets subsection 15.2's definition of a default. Global then characterizes Rockstad's failure to pay timely rent in September 1999 as "his second default within a two-month period." In Global's view, this second default triggered subsection 15.4's "renewed default" provision. Global contends that subsection 15.4, in turn, authorized it to reject Rockstad's late payment—tendered sometime during the weekend of September 10–12—and to issue its September 13 notice to vacate the premises immediately.

As Global interprets subsection 15.4, then, the provision did not require written notice to Rockstad as a condition of his second default. According to Global, Rockstad lost his right to tender late payment on September 1, as soon as his September rent became late:

> [D]efault occurs under [sub]section 15.2 when the tenant fails to cure within ten days of notice of the failure to make a payment. In contrast, [sub]section 15.4 deals with the tenant, such as Rockstad, who defaults a second time within two months. In the case of a renewed default under [sub]section 15.4, the default occurs immediately. There is no requirement of notice or a ten-day period in which to cure.

As Global correctly observes, the superior court adopted this interpretation of the renewed-default provision. The court found that subsection 15.4 unambiguously made Rockstad's failure to pay timely rent in September a second default and that "Global was neither required to give notice nor provide a 10[-]day grace period following the due date[.] . . . Global's interpretation of the lease is right and a second default technically occurred that would justify forfeiture." The court nevertheless declined to order eviction because it found that Rockstad's second breach was non-material.

Rockstad disputes this interpretation. Because subsection 15.4 expressly required the court to find that Rockstad's failure to pay his September rent amounted to the commission of a "default described above"—that is, a default under subsection 15.2's description of a default for failure to pay rent—and because subsection 15.2 expressly defines "default" as a failure to pay rent "as and when due, *where such failure shall continue for a period of ten (10) days after written notice thereof*" (emphasis added), Rockstad reasons that the literal terms of the lease precluded a second default from occurring without written notice and a ten-day period to allow late payment.[15]

## D. Interpreting the Renewed–Default Provision

■ Having examined the terms of the lease in light of the record and the parties' arguments, we conclude that subsection 15.4 is genuinely ambiguous. On the one hand, as Rockstad asserts, "Global's argument that a renewed default under [sub]section 15.4 'occurs immediately' flies in the face of the express language in [sub]section 15.4 that the

---

**14.** *Id.* (citing *McBain v. Pratt*, 514 P.2d 823, 828 (Alaska 1973)).

**15.** Rockstad also contends that the due date for payment of rent under the lease is ambiguous. In support of this argument, he points to DeWitt's customary willingness to accept rent within the first ten days of each month, to purported "judicial admissions" made by Global in its notice to quit and its complaint, and to the language of subsection 4.2's late-charge provision—which makes unpaid rent penalty-free for ten days after it falls due. Rockstad argues that the ambiguity as to the due date for payment must be resolved in his favor. In our view, however, this

argument is meritless. Subsection 4.1 of the lease is clear in stating that monthly rent "shall be payable in advance, on the first (1st) day of each month." Neither the landlord's customary willingness to tolerate late payment nor subsection 4.2's provision allowing a ten-day period of late payment without penalty renders subsection 4.1's due-date provision ambiguous. Moreover, even under Rockstad's interpretation, his payment would still have been late, since Rockstad admits that he did not actually tender payment before the close of business on Friday, September 10.

tenant must commit a default as 'described above,' i.e. under [sub]section 15.2, Failure to Pay Rent." On the other hand, however, as Global justifiably responds, even though literally sensible, Rockstad's interpretation would make subsection 15.4 utterly superfluous; for if we construed subsection 15.4 to say that a renewed default can occur only after written notice and a ten-day period for cure, the renewed-default provision "would not provide any additional redress for Global beyond that provided in [sub]section 15.2."

In short, each party convincingly counters the other's suggested interpretation of subsection 15.4. Because each party persuasively defeats the other's proposed reading of the lease's renewed-default provision, neither proposal resolves the problem of ambiguity. Accordingly, we must apply the principles of contract interpretation mentioned above to interpret the lease.

As previously noted, the lease's rent provision—subsection 4.1—makes rent payable *"without* notice or demand." But the lease provision governing default for overdue rent—subsection 15.2—makes failure to pay timely rent a default only upon written notice and only if the tenant thereafter fails to cure the deficiency within ten days. By tying a default's existence to the issuance of prior written notice, subsection 15.2 arguably treats written notice as an essential attribute of default. Under this theory, the landlord's delivery of notice declares that the landlord is unwilling to accept late charges and interest as a substitute for timely payment; it also signals the tenant that ten days remain to cure the default that arises upon issuance of the notice. When read in this way, then, subsection 15.2 would provide that a default arises upon notice but remains open to cure for ten days thereafter.

In contrast to subsection 15.2, the renewed-default provision of subsection 15.4 treats a second failure of payment somewhat more harshly. In describing a renewed default as the commission of "any default described above a second time" without mentioning a second opportunity for cure, subsection 15.4 seems to announce an intent not to leave the second default open to cure after it has arisen. Thus, the renewed-default provision can plausibly be read as empowering the landlord to declare a default without having to afford the tenant the luxury of a subsequent right to cure.

Far less clear, however, is whether subsection 15.4's language also means to dispense with subsection 15.2's requirement that the landlord serve written notice on the tenant. Subsection 15.4 expressly requires commission of a "default described above." In the context of Rockstad's case, this would require a default described in subsection 15.2. As we have already mentioned, written notice is an explicit element of a default as described in that section—indeed, notice arguably is the very element that gives rise to a default under subsection 15.2.[16] Literally speaking, then, subsection 15.4's reference to a "default described above" encompasses subsection 15.2's notice provision. And it is not illogical to construe subsection 15.4's definition of renewed default to incorporate subsection 15.2's requirement of written notice. The central purpose of subsection 15.4's renewed-default provision is to cut off the tenant's right to a ten-day grace period after a second default. Requiring the landlord to give written notice of the second default has no obvious effect on that purpose.

In summary, interpreting subsection 15.4 to require that a second default be preceded by written notice is textually plausible;[17] it

---

**16.** Without written notice, past-due rent is simply "payable," or at most, payable with a late charge. Lease, §§ 4.1, 4.2.

**17.** The dissent attempts to demonstrate that our interpretation is textually impossible by paraphrasing it in an awkward manner and then substituting the awkward phrasing for subsection 15.4's use of "default." *See* Dissent at 592. This supposed textual problem can be resolved by choosing less awkward phrasing:

15.4 *Renewed Default.* The commission by Tenant of any *failure to tender rent before notice of untimely payment* described above a second time and within two (2) months following the time when Tenant has been given notice of such a *failure to tender rent before notice of untimely payment* under *Section 15.2 . ...* and has cured the same within the permitted time. This rephrased definition nullifies nothing in subsection 15.4, yet avoids nullifying section 15's apparent purpose of defining "default" as that

arguably effectuates the reasonable expectations of the contracting parties; and it renders none of the disputed lease provisions superfluous. This interpretation also resolves subsection 15.4's ambiguity in a way that favors continuing the lease and that disfavors the lessor and drafting party, Global.[18] Accordingly, we conclude that this interpretation of subsection 15.4 should apply to Rockstad's situation.[19]

 So construed, subsection 15.4 gave Global the right to declare a second default at any time after Rockstad's September rent became due without being paid; to declare the default, Global had only to issue written notice of the deficiency; and upon issuance of the notice, Rockstad would have had no right to cure the default by tendering late payment. But as long as Global did not serve Rockstad with written notice, he was not in default as described in subsection 15.2; and subsection 15.4 therefore offered Global no ground for refusing his tender of late payment or for exercising its remedies under section 16.

It is undisputed that Rockstad tendered late payment before Global issued its September 13 notice to quit. It follows, then, that he was not in default at the time of the notice. Accordingly, we must reverse the superior court's decision that a second default occurred. We also must vacate the provision of the superior court's order that requires Rockstad to pay the reasonable costs of the superior court proceedings—a provision that appears to be predicated on the superior court's finding of a second default.[20]

## IV. CONCLUSION

Because Rockstad did not commit a second default under the lease, we REVERSE the superior court's finding of a second default and VACATE its order requiring Rockstad to pay reasonable costs of the superior court proceedings.

MATTHEWS, Justice, with whom FABE, Chief Justice, joins, dissents.

MATTHEWS, Justice, joined by FABE, Chief Justice, dissenting.

### I.

Is a renewed default under subsection 15.4 a failure to pay on time or must it meet the requirements in subsection 15.2 for an initial default? I agree with the superior court that the former meaning was intended. If subsection 15.4 duplicated subsection 15.2 it would serve no purpose. The language of

word is used throughout the lease—including its use in subsection 15.4.

**18.** The dissent does not deny that subsection 15.4 is ambiguous but would resolve the ambiguity by giving "default" its ordinary meaning as used in the subsection. Dissent at 591. But this approach has three drawbacks. First, it seems paradoxical to give "default" its ordinary meaning when it appears in a contractual provision whose very purpose is to define the word to have a special meaning. Second, the dissent's approach artificially divorces the word "default" from its immediately accompanying modifiers, "described above"—words that unambiguously refer to the definition of default in subsection 15.2 and that the drafter of the lease presumably intended to have their ordinary meaning. And third, the dissent's approach disregards the three canons of construction instructing us to resolve ambiguity in favor of continuity and against the lessor and the drafter.

**19.** See *Wessells*, 562 P.2d at 1048.

**20.** Although it is not clear from the record that the superior court's order requiring Rockstad to pay Global's reasonable costs for the proceedings encompassed Global's attorney's fees, both parties assume that it did. Given our conclusion that Rockstad did not commit a renewed default, and our resulting decision to vacate the cost order, we need not resolve the issue of the cost order's scope. Our conclusion similarly makes it unnecessary to address Rockstad's arguments challenging other aspects of the superior court's order that depend on its finding of a second default; nor need we consider Rockstad's claim that the superior court erred in failing to award him prevailing-party attorney's fees. We nevertheless note that our decision will now make Rockstad the prevailing party in the superior court proceedings; accordingly, on remand, he must be permitted to apply for prevailing-party attorney's fees under Civil Rule 82. We further note that our decision does not affect the validity of the superior court's order requiring Rockstad to pay late rent and accrued interest. Since Rockstad has previously tendered—and Global has refused to accept—payment for these items, their inclusion in the judgment will not impair Rockstad's status as prevailing party on remand.

subsection 15.4 makes clear that renewed defaults need not contain two of the elements of initial defaults, notice and failure to cure. And "default" must be interpreted in accordance with its ordinary meaning—failure to pay on time.

To facilitate understanding of the issue, the relevant provisions of section 15 of the lease governing defaults are set out here:

15. *DEFAULTS.* The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

. . . .

15.2 *Failure to Pay Rent.* The failure by Tenant to make any payment of rent or any other payment required to be made by Tenant hereunder as and when due, where such failure shall continue for a period of ten (10) days after written notice thereof by Landlord to Tenant;

. . . .

15.4 *Renewed Default.* The commission by Tenant of any default described above a second time and within two (2) months following the time when Tenant has been given notice of such a default under *Section 15.2* . . . and has cured the same within the permitted time.

The interpretative problem in this case arises from the interaction of subsections 15.2 and 15.4. Under subsection 15.2 a default has three elements, namely (1) the tenant must fail to pay rent or other payments on the due date, (2) the landlord must give the tenant written notice that the tenant has failed to pay on the due date, and (3) the tenant must fail to pay for another ten days after the landlord has given written notice.

Subsection 15.4 states that when a "default described above" is committed a second time that is also a default. Does "default" as that word is used in subsection 15.4 have the same three-element meaning as defaults under subsection 15.2 or does it mean something else? Despite the literal language of

subsection 15.4 and appellant's argument that a renewed default under subsection 15.4 contains the same elements as an initial default under subsection 15.2, it is obvious that the lease contemplates that a renewed default need not have the same three elements as an initial default. Otherwise, the renewed default clause would serve no purpose. The remedies under the lease for a default are the same whether the default is an initial or a renewed default. Thus if a renewed default were merely a duplicate of an initial default the parties would not have taken the trouble to put the concept of renewed defaults into the lease.[1]

Further, the explicit terms of subsection 15.4 make it clear that the term "default" in 15.4 has a narrower meaning than an initial default. Subsection 15.4 refers to "notice of such a *default* under Section 15.2." "Default" in this phrase does not include notice as an element of the meaning of "default," for notice is stated to occur separately. First there is a default, then there is notice. Likewise, "default" in subsection 15.4 does not include the element of failure to cure within ten days after notice. Refer here to the phrase at the end of subsection 15.4: "has cured the same within the permitted time." "[T]he same" refers to "default." But we know that under subsection 15.2 if there is a cure within the permitted time there is no default. It follows that a subsection 15.4 default does not encompass the failure to cure element that is part of a subsection 15.2 default.

In short, both because subsection 15.4 would serve no purpose if a renewed default contained the same three elements as an initial default under subsection 15.2 and because "default" as used in subsection 15.4 is referred to as having occurred before notice and despite a timely cure, "default" in subsection 15.4 cannot reasonably be said to have the same meaning as initial defaults under subsection 15.2.

---

1. *See* RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1979):

In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:

(a) an interpretation that gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect[.]

Since subsection 15.4 defaults are different from defaults as defined in subsection 15.2 what does "default" mean in subsection 15.4? The answer is that it has its common and ordinary meaning. It means failure to pay when payment is due.[2],[3] There are two reasons for this conclusion.

First, as discussed above, two of the three elements of an initial default, notice and failure to cure, are excluded from the meaning of a renewed default by the language of subsection 15.4. This leaves only the first element, failure to pay on time.

Second, the conclusion follows from the rule that in contracts, as well as in statutes, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."[4] Here the word "default" is "otherwise defined" and given a special meaning in subsection 15.2. But we have seen that the definition contained in subsection 15.2 cannot reasonably be said to apply to subsection 15.4. Thus the common, generally prevailing meaning of the word "default" must apply.

In interpreting the meaning of the words of a contract a court should seek to put itself in the position of the parties at the time the contract was made.[5] Here, it is easy to imagine what the parties would have said if a disinterested bystander had pointed out before the lease was signed that subsection 15.4's referral to "any default described above" could not logically include all the elements of a subsection 15.2 default. They would have said, I believe, that they meant subsection 15.4 to refer simply to a second failure to pay on time. They might well have explained that such a failure is an event "described above." And they may have add-

ed that while they expected toleration of an initial failure—thus the three-part definition for initial defaults—a second failure closely following an initial default would be considered a breach. What the parties actually would have said will of course never be known, but I can think of no other meaning for subsection 15.4 that is reasonably likely to have been intended.

For these reasons I agree with the superior court's ruling that the tenant's failure to pay rent on time in September, after his cured failure to pay in August, was a renewed default. I thus would affirm the decision of the superior court requiring the tenant to reimburse the landlord's litigation costs.

## II.

I have described above how I would decide this case, and why. But it may also be advisable to explain directly why I believe that the definition settled upon by the majority is untenable. The majority concludes that "default" as used in subsection 15.4 contains two of the three elements of a subsection 15.2 default, failure to pay on time and written notice of such failure. There are three interrelated problems with so defining a renewed default under subsection 15.4.

The first is that it is not related to either the actual or the objectively measured expectations of the parties. Neither party contends that it intended or expected that "default" in subsection 15.4 would mean "failure to pay on time combined with written notice of such failure." Nor do the rules and standards in aid of interpretation of agreements point to such a meaning.[6] They require that

2. More completely, in view of subsection 15.3 which deals with failure to perform covenants, "default" in subsection 15.4 means failure to pay or perform when payment or performance is due. I focus on failure to pay in this opinion for the sake of brevity because that is the default that occurred.

3. See WEBSTER'S NEW WORLD DICTIONARY, Third College Edition (1988): "default: failure to do something ... when required ...; specific., a) failure to pay money due...."

4. State v. Niedermeyer, 14 P.3d 264, 272 n. 38 (Alaska 2000); see also RESTATEMENT (SECOND) OF

CONTRACTS § 201 cmt. a: "Unless a different intention is shown, language is interpreted in accordance with its generally prevailing meaning. See § 202(3)." Section 202(3) in turn provides "[u]nless a different intention is manifested, (a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning[.]"

5. See RESTATEMENT (SECOND) OF CONTRACTS § 202 cmt. b.

6. See id. §§ 202, 203.

words either should be taken to mean what the agreement defines them to mean, or that they be interpreted in accordance with their generally prevailing meaning.[7] "Failure to pay on time combined with written notice of such failure" is neither the special meaning of default "described above" in subsection 15.2, nor is it the meaning of "default" in general usage. Instead it is a special meaning which is not defined in the lease.

The second problem with the failure-to-timely-pay-plus-notice definition is that it does not work textually in subsection 15.4. This is how subsection 15.4 would read with "failure to pay on time combined with written notice of such failure" substituted for "default" in subsection 15.4:

> 15.4 *Renewed Default.* The commission by Tenant of any *failure to pay on time combined with written notice of such failure* described above a second time and within two (2) months following the time when Tenant has been given notice of such a *failure to pay on time combined with written notice of such failure* under *Section 15.2* ... and has cured the same within the permitted time.

The proposed definition duplicates and thus renders superfluous the "has been given notice" language subsection 15.4 contains.[8] The parties could not have intended "default" as used in subsection 15.4 to include the concept of notice, for they refer to notice as a separate event.[9]

The third problem concerns the use of the rule, sometimes referred to as *"contra proferentem,"* that ambiguities are construed against the draftsman. This rule does not apply in this case for two reasons. First, *contra proferentem* only applies to meanings asserted by a party.[10] In this case neither party asserts that "failure to pay on time combined with notice of such failure" is the meaning of "default" in subsection 15.4.

Second, *contra proferentem* is a rule of last resort, and it only should be used where other rules and standards in aid of interpretation do not resolve the question of what a disputed term means.[11] In other words, if after the rules and standards in sections 202 and 203 of the RESTATEMENT (SECOND) OF CONTRACTS are applied one competing meaning is found to be no longer reasonable, *contra proferentem* will not be employed.

Here the rules and standards in aid of interpretation result in the conclusion that "failure to pay on time combined with notice of such failure" is not a reasonable meaning of "default" as used in subsection 15.4. As I have explained above, this definition is excluded by the rule that words take their ordinary meaning unless they are otherwise defined in an agreement (it is neither the

---

7. *See id.* § 202(3)(a).

8. The same duplicative notice problem exists in the phrasing used by the majority in footnote 17.

9. By contrast, there are no textual problems when "failure to pay on time" is substituted for "default" in 15.4:

> 15.4 *Renewed Default.* The commission by Tenant of any *failure to pay on time* described above a second time and within two (2) months following the time when Tenant has been given notice of such a *failure to pay on time* under *Section 15.2* ... and has cured the same within the permitted time.

10. Comment a to section 206 of the RESTATEMENT (SECOND) CONTRACTS provides:

> Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, *so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party.* The rule is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position, but it is not limited to such cases. It is in strictness a rule of legal effect, sometimes called construction, as well as interpretation: its operation depends on the positions of the parties as they appear in litigation, and sometimes the result is hard to distinguish from a denial of effect to an unconscionable clause. (Emphasis added.)

11. *Supra* note 10; *Quad Constr., Inc. v. Wm. A. Smith Contracting Co.,* 534 F.2d 1391, 1394 (10th Cir.1976) (recognizing "rule that words of a contract are to be taken most strongly against the party using them 'is the last rule to be resorted to, and never to be applied except when other rules of interpretation fail.' ") (quoting *Patterson v. Gage,* 11 Colo. 50, 16 P. 560, 562 (1888)).

ordinary nor the otherwise defined meaning) and by the rule disfavoring interpretations that leave contract terms meaningless (it renders meaningless the "has been given notice" clause of subsection 15.4). Thus the question of meaning as between the choices offered by the majority opinion and this dissent can be resolved without the use of *contra proferentem*. When this can be done, *contra proferentem* should not be used.

For the above reasons I respectfully dissent.