NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| A.L. COZZETTI, | ) | |
| | ) | Supreme Court No. S-15117 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-08-12107 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| RAY MADRID, | ) | AND JUDGMENT[*] |
| | ) | |
| Appellee. | ) | No. 1659 – December 13, 2017 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Alex Swiderski, Judge pro tem.

Appearances: Anthony L. Cozzetti, Anchorage, pro se, Appellant. Goriune Dudukgian, Alaska Legal Services Corporation, Anchorage, for Appellee. Kathryn R. Vogel, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Amicus Curiae State of Alaska.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I.    INTRODUCTION

This case concerns a contract that contains elements of both a lease and an installment purchase agreement. Ray Madrid, the purchaser or lessor of a mobile home, fell behind on his monthly payments, and Anthony Cozzetti, claiming to be the owner of the mobile home, brought a forcible entry and detainer (FED) action to evict him.

---

[*]    Entered under Alaska Appellate Rule 214.

Madrid argued that he was a purchaser, not a renter, and that therefore he could not be evicted through an FED action. He also argued that Cozzetti had violated the Unfair Trade Practices and Consumer Protection Act (UTPA) by misrepresenting the ownership of the mobile home and by asserting in the FED action that Madrid was merely a renter. We affirm the superior court's determination that Madrid was a purchaser and therefore had the right to redeem his interest in the mobile home. We also agree that Cozzetti's misrepresentation of Madrid as a renter violated the UTPA. But we find that Cozzetti's misrepresentations as to ownership did not violate the UTPA, and we remand for correction of a potential clerical error.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

In 2005 Ray Madrid entered into a contract relating to a mobile home. The first paragraph of the document provided that "Agency for Native Advocacy, Inc.," the purported owner of the mobile home, "does agree to sell on a Lease with Option to Purchase, or on a PURCHASE AGREEMENT, . . . and [Madrid] does agree to purchase and take possession of the subject property." Madrid agreed to make a down payment of $1,900, plus a "special payment" of $100, along with monthly payments of $400 for 53 months. According to the contract, these monthly payments plus the down payment would total the purchase price of $19,000 plus ten percent interest. Madrid would have an option to purchase the mobile home for $19,000, which he could exercise "at any time provided that the entire principal portion due . . . and any outstanding late fees are paid at that time." If he chose to exercise the option, all monthly payments made would be credited toward the purchase price. Thus after making the down payment and all 53 monthly payments, Madrid would be able to obtain title to the mobile home for no additional cost. The contract was signed by Madrid and by A.L. Cozzetti "for Seller."

The contract also provided a remedy in the event of Madrid's default. "In the event of default, this agreement is null and void and all monies paid will be considered rents and Tenant relinquishes all purchase option monies and rights." Additionally, "[i]n case of non-payment of . . . monies when due . . . , Tenant does hereby waive all rights to equitable ownership and forfeits all funds paid to the Owner at that time."

According to Cozzetti's records, Madrid made an initial payment of $1,500 followed by regular monthly payments, although his payments were occasionally late, and by the end of 2006 he was $520 behind the payment schedule. He fell further behind through 2007 and 2008, until on November 25, 2008, Cozzetti filed an FED action in the district court.

## B. Proceedings

In his FED complaint, Cozzetti alleged that he was the owner of the mobile home and that Madrid was a renter. He sought possession of the mobile home, payment of at least $1,722 in "past due rent," and damages. After a hearing on December 1, 2008, at which both parties represented themselves, the district court granted judgment for possession to Cozzetti.

Madrid obtained counsel and filed a motion on December 2 to set aside the judgment for possession. Madrid argued that the contract was a purchase agreement, not a rental agreement, and that he had built up equity in the home through his monthly payments, meaning that the district court lacked jurisdiction to decide the dispute.[1] He also pointed out that the contract stated that the mobile home was owned by the Agency

---

[1]    *See* AS 22.15.050 (providing district courts lack jurisdiction over actions "in which the title to real property is in question" and actions "of an equitable nature").

for Native Advocacy, Inc., and Cozzetti had provided no proof that he held title to the home.

On December 24 the case was removed to the superior court. And on December 29 the superior court granted Madrid's motion to set aside the district court's judgment for possession, finding that Cozzetti had not established that he owned the mobile home.

Cozzetti filed a separate complaint for ejectment on January 29, 2009, again claiming that he was the owner of the property and that Madrid was simply a renter.[2] Madrid denied most of the allegations in the complaint and asserted a counterclaim under the UTPA, which broadly prohibits "unfair or deceptive acts or practices in the conduct of trade or commerce,"[3] alleging that Cozzetti violated the UTPA by filing the FED action and asserting that Madrid was merely a tenant rather than a purchaser of the mobile home. Madrid requested declaratory relief as well as damages.

The ejectment action was consolidated with the original FED action in March. The court then asked the parties to brief two issues: (1) whether Madrid had "an equitable interest . . . in the property . . . that would prevent the [c]ourt from proceeding with a standard FED process" and (2) whether Madrid had nonetheless waived or forfeited that interest upon default. Madrid noted the contract's similarity to the agreement in *Kopanuk v. AVCP Regional Housing Authority*,[4] which created equitable interests in the purchaser or lessor that were sufficient to preclude an FED action.[5] He also argued that the forfeiture provisions in the contract were inequitable and should not

---

[2]    *See* AS 09.45.630 (providing for actions to recover real property).

[3]    AS 45.50.471(a).

[4]    902 P.2d 813 (Alaska 1995).

[5]    *Id*. at 817.

be enforced. The superior court agreed with Madrid and dismissed Cozzetti's FED claims, leaving just the ejectment action.[6]

In April Cozzetti filed a title document showing himself and "AK Paging & Communications Inc." as the owners of the mobile home. He acknowledged that he had obtained this title after filing his initial FED complaint, and that neither he nor Agency for Native Advocacy, Inc., had previously held title; instead, title had always been held by Alaska Paging & Communications, Inc., which he owned.

At a pre-trial conference held in June 2009, the court ordered Madrid to make monthly payments of $400 into the court registry. After a contentious discovery process and several continuances, a trial on the remaining claims — Cozzetti's claim for ejectment and Madrid's UTPA counterclaims — was held in May 2011.

The court issued a written order on Cozzetti's ejectment claim in July 2011. It first held that the mobile home was personal property, not real property, meaning that the transaction was subject to the UTPA.[7] It then held that the contract was an installment purchase agreement and not a lease, noting that the contract refers to itself as a purchase agreement that reverts to a lease upon default and that, "[m]ost importantly, it specifically provides that title will be transferred to Madrid if he makes the required payments."

Having determined that Madrid was a buyer, not a renter, the court reiterated that it would not enforce the forfeiture provisions of the contract. Instead, it held that Madrid would be entitled to the property after paying the full purchase price

---

[6]     Cozzetti had filed another FED action in May 2009, which was also consolidated with this case.

[7]     *See State v. First Nat'l Bank of Anchorage*, 660 P.2d 406, 414 (Alaska 1982) ("[T]he sale of real property is not within the regulatory scope of the [UTPA]."). Cozzetti does not appeal this determination.

plus any taxes or insurance. Because Madrid had already paid more than the remaining balance into the court registry, the court held that Madrid had a right to title to the mobile home and ordered Cozzetti to convey title within five days.

In October 2011 the court issued a second order, addressing Madrid's UTPA counterclaims. First, it held that Cozzetti had violated the UTPA when bringing his initial FED action by misrepresenting to the court that Madrid was a mere renter. Second, the court held that Cozzetti's two misrepresentations as to the title of the property — first when he indicated on the contract that the property was owned by the Agency for Native Advocacy, Inc., and second when he represented to the court that he was in fact the owner — also violated the UTPA. The court awarded Madrid damages totaling $1,500 ($500 for each violation).[8]

Cozzetti appeals.

## III.   STANDARD OF REVIEW

"Issues of contract interpretation generally present questions of law, which we review de novo."[9] However, "when the trial court relies on extrinsic testimonial evidence to provide a factual basis for its interpretation of a contract, we apply the clearly erroneous standard in reviewing the court's background findings of fact."[10] "A finding

---

[8]   *See* AS 45.50.531(a) ("A person . . . may bring a civil action to recover for each unlawful act or practice [under the UTPA] three times the actual damages or $500, whichever is greater.").

[9]   *Rockstad v. Glob. Fin. & Inv. Co.*, 41 P.3d 583, 586 (Alaska 2002) (citations omitted).

[10]   *Id.* (citing *Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 122 (Alaska 1991)).

of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that the trial court has made a mistake."[11]

A trial court's decision whether to enforce a forfeiture provision in a contract is a question of equity, which "will not be set aside unless it is against the clear weight of the evidence."[12]

We review questions of statutory interpretation, including interpretation of the UTPA, using our independent judgment.[13] "Under this standard the court adopts the rule of law that is most persuasive in light of precedent, reason, and policy."[14]

## IV. DISCUSSION

### A. The Contract Was A Purchase Agreement.

The central question in this case is whether the contract was a lease with an option to purchase or an installment purchase agreement. "Typically a lease will not give rise to equitable interests in the lessee,"[15] making FED jurisdiction appropriate and forfeiture a non-issue.[16] But "an installment contract often will give rise to equitable

---

[11] *Adams v. Adams*, 89 P.3d 743, 749 (Alaska 2004) (citing *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993)).

[12] *Dillingham Commercial Co. v. Spears*, 641 P.2d 1, 7 (Alaska 1982) (citing *Moran v. Holman*, 501 P.2d 769, 771 (Alaska 1972); *Jameson v. Wurtz*, 396 P.2d 68, 74 (Alaska 1964)).

[13] *See W. Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.*, 101 P.3d 1047, 1048 (Alaska 2004).

[14] *Id.* (citing *In re Life Ins. Co. of Alaska*, 76 P.3d 366, 368 (Alaska 2003)).

[15] *Kopanuk v. AVCP Reg'l Hous. Auth.*, 902 P.2d 813, 816 (Alaska 1995).

[16] *See* AS 22.15.050.

interests in the purchaser"[17]: "The purchaser under an installment land contract is treated as the equitable owner and the vendor as holding the bare legal title merely as security for the purchase price."[18] If the contract in this case gave rise to these equitable interests, FED jurisdiction was inappropriate, and we must address whether the superior court properly declined to enforce the forfeiture.

When interpreting a contract, courts aim to determine and give effect to the parties' reasonable expectations.[19] "The parties' reasonable expectations are assessed through resort to the language of the disputed provision and other provisions of the contract, relevant extrinsic evidence, and case law interpreting similar provisions."[20]

Cozzetti argues that the contract unambiguously provided that Madrid would remain a renter until he exercised the purchase option. The first paragraph of the contract belies this claim, however: Madrid agreed "to *purchase* and take possession of the subject property . . . commencing on Dec. 20, 2005."[21] (Emphasis added.) As the

---

[17]     *Kopanuk*, 902 P.2d at 816.

[18]     *Id.* (quoting *Dillingham Commercial Co. v. Spears*, 641 P.2d 1, 7 n.7 (Alaska 1982)).

[19]     *Zamarello v. Reges*, 321 P.3d 387, 393 (Alaska 2014).

[20]     *Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 316 (Alaska 2013) (emphasis omitted) (quoting *Fairbanks N. Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1024 (Alaska 1986)).

[21]     This language also undermines Cozzetti's claim that the superior court improperly modified the contract. To the contrary, the court interpreted the contract and resolved ambiguities, leading "not to the amendment of the parties' agreement but to the implementation of the agreement that they intended all along." *McCarter v. McCarter*, 303 P.3d 509, 514 (Alaska 2013); *see also 3-D & Co. v. Tew's Excavating, Inc.*, 258 P.3d 819, 826 (Alaska 2011) ("[T]he superior court did not reform the contract, but properly resolved contractual ambiguities by examining extrinsic evidence . . . .").

superior court found, the contract "is a mishmash of provisions that appear to be drawn from purchase agreements, leases, and options to purchase."

The contract does resemble a lease in some respects. The first paragraph describes the contract as "a Lease With Option to Purchase," and the paragraphs that follow impose obligations on Madrid typical of a lease. They provide, for example, that "[t]he Tenant will not sublet subject property . . . without written consent of Owner," "will not . . . disturb the neighborhood," and will "keep[] the outside area of the subject property neat, clean and clear of all trash and debris." These obligations are similar to those set out in the Alaska Uniform Residential Landlord and Tenant Act (URLTA).[22] The contract also provides that Madrid's "Monthly Lease Payments" would be credited toward the purchase price.

This mention of "Monthly Lease Payments," however, is the only point at which the contract refers to Madrid's monthly payments as lease payments or rent. The same section provides that the monthly payments are composed of a "Mortgage Amortization Base Amount," plus taxes and insurance payments. And the "Mortgage Amortization Base Amount" is composed of "principal [and] interest." Similarly, in the first section of the contract, Madrid agrees to make "[m]onthly payments, which include principal and interest, . . . for a period of 53 months." And the contract provides for Madrid to make an initial payment of $2,000, to which it refers as a "down payment" throughout. These references to "mortgage amortization," "principal," "interest," and a "down payment" suggest that Madrid was making payments on a loan — thereby gaining equitable interests in the property — rather than simply paying rent.

---

[22] *See* AS 34.03.060(a) (prohibiting subletting without landlord's consent); AS 34.03.120(a) (providing tenant obligations under the URLTA, including keeping property neat and refraining from disturbing neighbors); c*f. Kopanuk*, 902 P.2d at 817 (observing that similar provisions in a disputed contract were typical of a lease).

Significantly, the contract specifically provides that Cozzetti will transfer title to Madrid upon completion of all monthly payments, with no additional payment needed to exercise the option. Such provisions are characteristic of installment agreements,[23] and the Alaska Uniform Commercial Code (UCC) specifically provides that transactions in the form of a lease may create a security interest if the "lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration on compliance with the lease agreement."[24]

The contract's default provisions also suggest that it was not intended as a lease. The agreement provides that "[i]n the event of default, . . . all monies paid will be considered rents," and Madrid would "waive all rights to equitable ownership and forfeit[] all funds paid." This implies that, prior to default, Madrid's payments would *not* be considered rents. Moreover, these terms would be superfluous if the funds were already considered rent and if Madrid never held any rights to equitable ownership, an outcome courts disfavor in construing a contract.[25]

At least two other provisions of the contract would also be without effect if it were a lease. The agreement requires a non-refundable initial payment of $2,000, but the URLTA prohibits security deposits of more than two months' rent as well as non-

---

[23] *Kopanuk*, 902 P.3d at 817.

[24] AS 45.01.213(b).

[25] *See Gibson v. Nye Frontier Ford, Inc.*, 205 P.3d 1091, 1097 (Alaska 2009) ("An interpretation that gives a lawful and effective meaning to the terms of a contract is to be preferred over an interpretation that leaves . . . a part of a contract unlawful or of no effect." (citing RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (AM. LAW INST. 1981))).

refundable security deposits.²⁶ And the agreement makes Madrid responsible for maintenance and repairs of the property and appliances, which under the URLTA must remain a landlord's responsibility.²⁷ These provisions would be flatly unlawful in a lease but entirely permissible in a purchase agreement, which indicates that the contract should be interpreted as the latter.

Cozzetti's testimony at trial also supported Madrid's position that the parties intended to form an installment contract. Cozzetti testified that when the parties first contracted, he "was thankful that [Madrid] *bought* the house" and "was happy that [Madrid] could take over the burden" of the property because "at that time the economy was not [good for landlords]." (Emphasis added.) Notably, he agreed with Madrid's counsel that the parties had a purchase agreement initially, arguing only that Madrid's default had turned it into a rental agreement.²⁸

The text of the contract thus contains provisions consistent with both a lease and a purchase agreement. But the provisions dictating how and when Madrid would pay for and take title to the property all seem to assume that Cozzetti was financing Madrid's purchase and that Madrid would pay for the mobile home in installments,

---

²⁶    AS 34.03.070.

²⁷    AS 34.03.100(a).

²⁸    Cozzetti has mostly abandoned this argument on appeal and now argues that Madrid was always a renter because he never exercised his purchase option by opening an escrow account for his monthly payments. But this argument presupposes that Madrid was a renter with a purchase option, and thus bypasses the central issue. If the contract was a purchase agreement — and we conclude that it was — failing to open an escrow account could arguably have been a breach of the contract, but Madrid does not dispute that he breached the contract. The real question, which we resolve in Madrid's favor below, is whether he thereby forfeited his equitable interests in the mobile home.

taking title upon payment of all installments. And Cozzetti's testimony at trial indicated that he intended to sell, not to lease, the mobile home. Accordingly, we affirm the superior court's determination that the contract was an installment purchase agreement and created equitable interests on the part of Madrid.

**B.** **The Superior Court Did Not Abuse Its Discretion By Declining To Enforce The Forfeiture Provisions.**

The purchase agreement provided that all funds paid and all equitable interests would be forfeited in the event of a breach. The parties do not dispute that Madrid defaulted by making several late payments. The superior court nonetheless declined to give effect to the forfeiture provisions, holding that this remedy for default was unlawful under principles of equity.

"It is well settled in this jurisdiction that equity abhors a forfeiture,"[29] and the superior court has the discretion to decline to enforce a forfeiture provision in a contract if equity so requires.[30] We will not set such a decision aside "unless it is against the clear weight of the evidence."[31]

The determination whether to enforce forfeiture provisions is not "a purely quantitative rule";[32] instead, the aim is "to permit [the parties] to have the benefit of their bargains" when it is equitable to do so.[33] Thus, in *Moran v. Holman*, even where the

---

[29]     *Allen v. Vaughn*, 161 P.3d 1209, 1213 (Alaska 2007) (quoting *Strack v. Miller*, 645 P.2d 184, 187 (Alaska 1982)).

[30]     *Dillingham Commercial Co. v. Spears*, 641 P.2d 1, 7 (Alaska 1982).

[31]     *Id.* (citing *Moran v. Holman*, 501 P.2d 769, 771 (Alaska 1972); *Jameson v. Wurtz*, 396 P.2d 68, 74 (Alaska 1964)).

[32]     *Moran*, 501 P.2d at 771.

[33]     *Strack*, 645 P.2d at 187; *see also Moran*, 501 P.2d at 771 ("[W]here
(continued...)

buyer on an installment contract had been behind on payments for most of the contract period, we affirmed the superior court's refusal to enforce the contract's forfeiture provisions.[34] Because the seller's intended benefit from the contract was receipt of the purchase price, we reasoned, the superior court did not err by giving the buyer 90 days to pay the remaining balance and redeem his interest in the property.[35] And when we affirmed the superior court's refusal to enforce a forfeiture in *Williams v. DeLay*, we emphasized that forfeiture "would cause a loss to the buyers all out of proportion to any injury that might be sustained by the seller."[36]

Although forfeiture may be appropriate if a breach is especially egregious,[37] this is not such an extreme case. Madrid made regular (if incomplete) payments, had paid approximately $13,900 when the superior court dismissed the FED actions in 2009, and had paid $20,370 out of a total $25,850 owed by the time the superior court entered judgment in 2011. There is no indication — and Cozzetti does not allege — that Madrid's breach was in bad faith. Moreover, Cozzetti accepted late payments for nearly

---

[33](...continued)
adequate compensation can be made . . . equity . . . discharges the forfeiture, upon such compensation being made." (omissions in original) (quoting *Knickerbocker Life Ins. Co. v. Norton*, 96 U.S. 234, 242 (1877))).

[34]    501 P.2d at 770-71.

[35]    *Id.*

[36]    395 P.2d 839, 846 (Alaska 1964) (quoting *Land Dev., Inc. v. Padgett*, 369 P.2d 888, 889 (Alaska 1962)).

[37]    *See Curry v. Tucker*, 616 P.2d 8, 13-14 (Alaska 1980).

two years before filing the FED action, which weighs against allowing those same late payments to lead to a forfeiture.[38]

Enforcing the forfeiture would deprive Madrid of his equity in the home; in contrast permitting him to pay the remaining balance has the virtue of putting the parties in the positions they bargained for at the outset, with Cozzetti receiving the purchase price and Madrid receiving the mobile home. In this case, the court abided by the general principle that "where adequate compensation can be made, equity will discharge the forfeiture upon such compensation being made."[39] This was not an abuse of discretion. And because Madrid retained his equitable interests in the mobile home, the court properly dismissed the FED actions.[40]

## C. The Superior Court May Have Made A Clerical Error.

There appears to be a clerical error in Madrid's favor in the superior court's order. It noted first that Madrid had paid Cozzetti $20,370 and that Cozzetti conceded as much at trial. Cozzetti does not contest this conclusion now, and Madrid did not allege at trial and does not allege now that he paid more than that amount. However, later in the order, the superior court wrote that Madrid had paid Cozzetti $23,370 and

---

[38]    *See Dillingham Commercial Co. v. Spears*, 641 P.2d 1, 8 (Alaska 1982) ("[T]he extreme remedy of forfeiture is an inappropriate form of relief for the mere late payment of rent, particularly where Spears failed to object to Dillingham's slowness over the course of nine years." (footnote omitted)).

[39]    *Strack*, 645 P.2d at 187. We also note that if the agreement created a security interest under the UCC, *see* AS 45.01.213, then Madrid was entitled to redeem the mobile home after default by paying the balance of the purchase price at any time before Cozzetti collected or disposed of it, AS 45.29.623. This right cannot be waived, except in circumstances not present here. AS 45.29.602(11).

[40]    *See Kopanuk v. AVCP Reg'l Hous. Auth.*, 902 P.2d 813, 817 (Alaska 1995) (a party with equitable interests in a property may not be evicted by a FED action).

calculated the remaining balance due based on that figure. The superior court did not explain this discrepancy and we could find no basis in the record for it. The superior court should address this matter on remand and correct any error in its calculations.[41]

### D. The Superior Court's UTPA Decision Was Partially Erroneous.

The UTPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce"[42] and includes an extensive list of prohibited acts.[43] "[I]ntent, scienter, actual reliance or damages, and even actual deception" are all unnecessary to show deception under the UTPA.[44] "All that . . . is required is proof that a practice has a tendency or capacity . . . to deceive even a significant minority of consumers."[45] However, private parties seeking damages rather than injunctive relief must show "an ascertainable loss of money or property as a result" of the unlawful act.[46]

The superior court found that Cozzetti violated the UTPA in three ways. First, in the contract, Cozzetti falsely represented that the mobile home was owned by the Agency for Native Advocacy, Inc. According to the superior court, this

---

[41] *See* Alaska R. Civ. P. 60(a) ("Clerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party . . . .").

[42] AS 45.50.471(a).

[43] *See* AS 45.50.471(b).

[44] *Borgen v. A & M Motors, Inc.*, 273 P.3d 575, 590 (Alaska 2012) (quoting *ASRC Energy Servs. Power & Commc'ns, LLC v. Golden Valley Elec. Ass'n, Inc.*, 267 P.3d 1151, 1163 (Alaska 2011)).

[45] *Id.* (quoting *ASRC Energy*, 267 P.3d at 1163).

[46] AS 45.50.531(a).

misrepresentation violated AS 45.50.471(b)(1), which prohibits "fraudulently conveying or transferring goods or services by representing them to be those of another." Second, in the original FED action Cozzetti represented to the court that he personally owned the mobile home when it was in fact owned by Alaska Paging & Communications, Inc.; this allowed him to bypass the requirements of AS 22.20.040(a)(2) and appear without retaining an attorney for the company. The superior court held that this also violated AS 45.50.471(b)(1). Finally, in his initial FED complaint, Cozzetti represented that Madrid had only a renter's interest in the mobile home, which the court held violated AS 45.50.471(b)(11) and (12). These subsections broadly prohibit deceptive conduct "in connection with the sale or advertisement of goods and services."[47]

### a.    Misrepresentations of ownership

Cozzetti argues that his two misrepresentations about the ownership of the mobile home did not violate AS 45.50.471(b)(1) because (1) at the time of the FED action, he was "the sole owner of a closely held corporation that . . . held title to" the mobile home, and (2) there was no "fraudulent[] convey[ance]"[48] because he did not actually convey the property until he was ordered to do so by the superior court after trial.

Cozzetti's first argument fails. There is a material difference between individual ownership and corporate ownership: Even "closely held corporations" must

---

[47]    AS 45.50.471(b)(11), (12).

[48]    AS 45.50.471(b)(1).

be represented by counsel in any proceeding, while individuals may represent themselves.[49]

Cozzetti's second argument, however, holds more water. The UTPA does not define what constitutes "fraudulently conveying," but AS 34.40, addressing fraudulent transfers of real property, does. "The term 'conveyance' . . . shall be construed to embrace every instrument in writing . . . by which an estate or interest in land is created, aliened, assigned, or surrendered."[50] The Judgment for Possession that Cozzetti obtained after misrepresenting himself as the owner of the mobile home did not create or assign an interest in the mobile home; rather, it ordered Madrid to vacate the property on the erroneous assumption that Cozzetti was entitled to possession. It did not purport to alter anyone's rights to the property, only to enforce those rights. Accordingly, Cozzetti's misrepresentation in the FED action that he personally owned the mobile home did not accomplish a fraudulent conveyance or transfer, and therefore did not violate AS 45.50.471(b)(1).[51]

---

[49] AS 22.20.040(a)(2) ("[A] corporation . . . shall appear by an attorney in all cases unless an exception . . . has been explicitly made by law."); *Roberts v. State, Dep't of Revenue*, 162 P.3d 1214, 1220-21 (Alaska 2007) (holding that even "closely held corporations" must be represented).

[50] AS 34.40.130. Because the superior court found that the mobile home was personal property, there was no "estate or interest in land" conveyed, but the core of this definition — that a conveyance must alter interests in property — is still relevant to the present situation.

[51] Madrid argues that this misrepresentation nonetheless violates the general prohibition on "unfair or deceptive acts or practices in the conduct of trade or commerce." AS 45.50.471(a). This may be so, but a private party seeking damages under the UTPA must also show "an ascertainable loss of money or property" as a result of the unlawful act. AS 45.50.531(a). The superior court did not rely on UTPA's general prohibition and it did not find an "ascertainable loss"; "[w]e will affirm on

(continued...)

Cozzetti's initial misrepresentation on the contract indicating Agency for Native Advocacy, Inc., as the owner of the property also falls outside of the scope of AS 45.50.471(b)(1). The statute prohibits "fraudulently conveying . . . goods . . . *by* representing them to be those of another,"[52] but there is no indication that this initial misrepresentation had any impact on Madrid's decision to purchase the mobile home, nor does Madrid claim that it did. In the absence of any evidence that the misrepresentation of ownership actually led to the conveyance or transfer of the mobile home, we cannot say that it violated AS 45.50.471(b)(1).[53]

### b.    Misrepresentation of Madrid as a renter

The superior court also found that Cozzetti violated AS 45.50.471(b)(11) and (12) by representing in his original FED action that Madrid was merely a renter. Subsection (b)(11) prohibits "conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a buyer . . . in connection with the sale or advertisement of goods or services." Subsection (b)(12) prohibits

---

[51](...continued) independent grounds not relied on by the superior court only when those grounds are established by the record as a matter of law." *Seybert v. Alsworth*, 367 P.3d 32, 36 (Alaska 2016). Madrid argues that Cozzetti's misrepresentation that he personally owned the mobile home allowed Cozzetti to evade the requirement that he be represented by counsel, and that "[a]n attorney . . . would not have been able to mislead the court . . . as to Madrid's ownership interest." But the agreement did partially resemble a lease, and an attorney could have made a colorable, if ultimately unsuccessful, argument that Madrid was a renter. We cannot conclude that, as a matter of law, Cozzetti's false statement that he owned the property resulted in Madrid's loss.

[52]    AS 45.50.471(b)(1) (emphasis added).

[53]    For the same reason, although this misrepresentation may have violated the UTPA's general prohibition on unfair and deceptive acts, we cannot conclude that it caused an "ascertainable loss" to Madrid. *See* AS 45.50.531(a).

using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged.

Cozzetti argues that his misrepresentation that Madrid was a renter did not mislead, deceive, or damage Madrid, and therefore could not have violated subsection (b)(11). In response Madrid argues that Cozzetti's misrepresentation that Madrid was a mere renter did in fact mislead the district court, and if the court had been aware that Madrid had equitable interests in the mobile home, it would have realized that it had no jurisdiction to enter a judgment for possession. The misrepresentation also meant that the court was not aware that Madrid was entitled to the protections afforded to purchasers by the UCC.[54] We conclude that Cozzetti's misrepresentation of Madrid as a renter damaged Madrid by leading the district court to improperly grant judgment against him without jurisdiction and without acknowledging his rights as a purchaser.[55]

However, to violate subsection (b)(11) or (b)(12), the deceptive conduct must also occur "in connection with the sale or advertisement of good or services."[56] In response to our request for supplemental briefing on this question, Cozzetti argues that this phrase excludes conduct that occurred after the sale. He argues that a statement that "occurred substantially 'post-sale,' " such as his representation to the district court that

---

[54]     *See, e.g.*, AS 45.29.623 (right to redeem collateral).

[55]     This harm also satisfies the requirement of AS 45.50.531(a) that a private party seeking damages must have "suffer[ed] an ascertainable loss of money or property."

[56]     AS 45.50.471(b)(11), (12).

Madrid had a mere renter's interest, could not have been made "in connection with" the sale.

Madrid responds that "in connection with" means "about" or "related to" the sale; the inquiry should be based on "the *subject matter* of the deception" rather than "*when* deceptive conduct occur[red]." (Emphasis in original.) The State, in its amicus curiae brief, agrees with Madrid's argument and suggests that because case law has already established that "the UTPA as a whole" covers post-sale conduct, excluding such conduct from the subsections would narrow the UTPA's scope and "the protections afforded Alaskan consumers." Madrid and the State cite cases from other states which have interpreted "in connection with" to liberally include conduct occurring after a sale if there is "some relation or nexus" between the act and the sale.[57]

For the reasons argued by Madrid and the State, we agree that the phrase "in connection with" should include post-sale conduct that is related to the sale.[58] We therefore affirm the superior court's judgment on this issue.

---

[57] *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 526-28 (Iowa 2005); *see also Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414 (Mo. 2014) (en banc) (construing "in connection with" to include "use of the enumerated deceptive practices if there is a relationship between the sale of the merchandise and the alleged unlawful conduct").

[58] Cozzetti did not raise the litigation privilege as an affirmative defense. This privilege generally immunizes parties and witnesses from liability for statements made during a judicial proceeding. *See Lawson v. Helmer*, 77 P.3d 724, 727 (Alaska 2003). This privilege does not apply if it would "effectively eviscerate" a statutory cause of action. *Cornelison v. TIG Ins.*, 376 P.3d 1255, 1277 (Alaska 2016) (holding litigation privilege did not apply to Alaska Workers' Compensation Act provision creating cause of action for misleading statements regarding workers' compensation benefits); *cf. Pepper v. Routh Crabtree, APC*, 219 P.3d 1017, 1023 (Alaska 2009) (holding superior court erroneously applied *Noerr-Pennington* immunity to exempt litigation activities from UTPA liability).

## V. CONCLUSION

We REVERSE the superior court's determination that Cozzetti's dual misrepresentations of ownership violated the UTPA, and we REMAND this case to the superior court for clarification of the amount Madrid owed Cozzetti after trial. We otherwise AFFIRM the superior court's decisions.